IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **CELLSPIN SOFT, INC**.<br><br>                Plaintiff,<br><br>v.<br><br>**FITBIT, INC.**<br><br>                Defendant. | **ORDER RE: OMNIBUS MOTION TO DISMISS; MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Case No. 17-cv-05928-YGR<br><br>Dkt. No. 31, 75 |
| v.<br><br>**MOOV, INC.**<br><br>                Defendant. | Case No. 17-cv-05929-YGR<br><br>Dkt. No. 29, 63 |
| v.<br><br>**NIKE, INC.,**<br><br>                Defendant. | Case No. 17-cv-05931-YGR<br><br>Dkt. No. 23, 63 |
| v.<br><br>**FOSSIL GROUP, INC. ET AL**<br><br>                Defendant. | Case No. 17-cv-05933-YGR<br><br>Dkt. No. 41, 81 |
| v.<br><br>**GARMIN INTERNATIONAL INC. ET AL**<br><br>                Defendant. | Case No. 17-cv-05934-YGR<br><br>Dkt. No. 27, 61 |
| v.<br><br>**CANNON U.S.A., INC.**<br><br>                Defendant | Case No. 17-cv-05938-YGR<br><br>Dkt. No. 43, 69 |
| v.<br><br>**GOPRO, INC.**<br><br>                Defendant. | Case No. 17-cv-05939-YGR<br><br>Dkt. No. 31, 66 |

| | |
|---|---|
| v.<br>**PANASONIC CORPORATION OF NORTH AMERICA**<br>Defendant. | Case No. 17-cv-05941-YGR<br>Dkt. No. 34, 67 |
| v.<br>**JK IMAGING, LTD.**<br>Defendant. | Case No. 17-cv-06881-YGR<br>Dkt. No. 43, 70 |

Plaintiff Cellspin Soft, Inc. ("Cellspin") brings fourteen patent infringement actions[1] alleging that each defendant infringed one or more of Cellspin's patents, namely U.S. Patent Nos. 8,738,794 (the "'794 Patent"); 8,892,752 (the "'752 Patent"); 9,749,847 (the "'847 Patent"); and 9,258,698 (the "'698 Patent") (collectively the "Asserted Patents").[2] Cellspin asserts claims 1–4, 7, 9, 16–18 and 20–21 from the '794 Patent; claims 1, 2, 4, 5, and 12–14 from the '752 Patent; claims 1-3 from the '847 Patent; and claims 1, 3–5, 7-8, 10–13, 15–20 from the '698 Patent. (*See, e.g., Cellspin Soft Inc. v. Fitbit, Inc.*, 17-cv-05928-YGR, Dkt. No. 1, Complaint for Infringement of U.S. Patents ("Complaint").)[3]

Defendants Fitbit, Moov, Nike, Fossil, Cannon, GoPro, Panasonic, and JK (the "Omnibus Defendants") have filed an omnibus motion to dismiss plaintiff's claims pursuant to Fed. R. Civ. Pro. 12(b)(6) on the ground that the asserted patents are not patent eligible under 35 U.S.C. § 101. (Dkt. No. 31,

---

[1] Nine actions are noted within the omnibus caption. Further, plaintiff's patent infringement action against Eastman Kodak Company was dismissed without prejudice on December 3, 2017. (*Cellspin Soft v. Eastman Kodak Company*, 17-cv-5940-YGR, Dkt. Nos. 14, 15.) Plaintiff's action against TomTom, Inc. and TomTom North America was dismissed without prejudice on January 25, 2018. (*Cellspin Soft v. TomTom, Inc., et al.*, 17-cv-5937-YGR, Dkt. Nos. 46, 47.) The following defendants remain: Fitbit, Inc. ("Fitbit"); Moov, Inc. ("Moov"); Adidas America, Inc. ("Adidas"); Nike, Inc. ("Nike"); Under Armor, Inc. ("Under Armor"); Fossil Group, Inc. and Misfit, Inc. (collectively "Fossil"); Garmin International, Inc. ("Garmin"); Cannon U.S.A., Inc. ("Cannon"); GoPro, Inc. ("GoPro"); Panasonic Corporation of America ("Panasonic"); Nikon Americas, Inc. and Nikon, Inc. (collectively "Nikon"); and JK imagining LTD ("JK"). Adidas, Under Armor, and Nikon have filed answers.

[2] The '794, '752 and '847 Patents are asserted against Fitbit, Moov, Adidas, Nike, Under Armor, and Fossil; the '698 Patent against Canon, GoPro, Panasonic and JK; and all four against Garmin and Nikon.

[3] Unless stated otherwise all citations to docket entries refer to *Cellspin Soft Inc. v. Fitbit, Inc.*, 17-cv-05928-YGR.

Motion to Dismiss Cellspin Soft, Inc.'s Complaints ("Omnibus MTD").) Also before the Court is defendant Garmin's motion for judgment on the pleadings pursuant to Rule 12(c) on the same ground. (*See Cellspin Soft Inc. v. Garmin International, Inc.*, 17-cv-5934-YGR, Dkt. No. 27.)

Having carefully reviewed the pleadings, the papers and exhibits submitted on these motions, the parties' arguments at the hearing held on March 6, 2018, and for the reasons set forth more fully below, the Court **GRANTS** the Omnibus Defendants' motion to dismiss Cellspin's complaints and **GRANTS** Garmin's motion for judgment on the pleadings.

## I. PATENTS AT ISSUE

Each of the four Asserted Patents is titled "Automatic Multimedia Upload for Publishing Data and Multimedia Content" and recites the same specification. (*See, e.g., Cellspin Soft, Inc. v. Garmin International, Inc.*, 17-cv-5934-YGR, Dkt. No. 1, Exs. A–D at 1:1-3.) Accordingly, the Court shall first discuss the '794 Patent and then highlight variations presented by the '752, '847, and '698 Patents, respectively.

### A. The '794 Patent

The specification for the '794 Patent describes a "method of utilizing a digital data capture device [such as a digital or video camera or wearable fitness tracker] in conjunction with a Bluetooth™ enabled mobile device for publishing data and multimedia content on one or more websites automatically or with minimal user intervention." (*Id*. at 3:28-32.) According to the patent, the conventional method for publishing data and multimedia content on a website was time-consuming required and manual user intervention:

> Typically, the user would capture an image using a digital camera or a video camera, store the image on a memory device of the digital camera, and transfer the image to a computing device such as a personal computer (PC). In order to transfer the image to the PC, the user would transfer the image off-line to the PC, use a cable such as a universal serial bus (USB) or a memory stick and plug the cable into the PC. The user would then manually upload the image onto a website which takes time and may be inconvenient for the user.

('794 Patent at 1:38-47.) The '794 Patent purports to solve this problem by "utilizing a digital data capture device in conjunction with a Bluetooth™ (BT) enabled mobile device" to "automatically publish[] data and

multi-media content on one or more websites simultaneously." (*Id*. at 1:33-36, 1:65-2:3.) Independent Claim 1 recites:

> *A method for acquiring and transferring data* from a Bluetooth enabled data capture device to one or more web services via a Bluetooth enabled mobile device, the method comprising:
>
> *providing a software module* on the Bluetooth enabled data capture device;
>
> *providing a software module* on the Bluetooth enabled mobile device;
>
> *establishing a paired connection* between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device;
>
> *acquiring new data* in the Bluetooth enabled data capture device, wherein new data is data acquired after the paired connection is established;
>
> *detecting and signaling the new data* for transfer to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer comprises:
>
> > *determining the existence of new data* for transfer, by the software module on the Bluetooth enabled data capture device; and
> >
> > *sending a data signal to the Bluetooth enabled mobile device*, corresponding to existence of new data, by the software module on the Bluetooth enabled data capture device automatically, over the established paired Bluetooth connection, wherein the software module on the Bluetooth enabled mobile device listens for the data signal sent from the Bluetooth enabled data capture device, wherein if permitted by the software module on the Bluetooth enabled data capture device, the data signal sent to the Bluetooth enabled mobile device comprises a data signal and one or more portions of the new data;
>
> *transferring the new data* from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device automatically over the paired Bluetooth connection by the software module on the Bluetooth enabled data capture device;
>
> *receiving,* at the Bluetooth enabled mobile device, *the new data* from the Bluetooth enabled data capture device;
>
> *applying,* using the software module on the Bluetooth enabled mobile device, *a user identifier* to the new data for each destination web service, wherein each user identifier uniquely identifies a particular user of the web service;

4

> *transferring the new data* received by the Bluetooth enabled mobile device along with a user identifier to the one or more web services, using the software module on the Bluetooth enabled mobile device;
>
> *receiving,* at the one or more web services, *the new data* and user identifier from the Bluetooth enabled mobile device, wherein the one or more web services receive the transferred new data corresponding to a user identifier; and
>
> *making available*, at the one or more web services, *the new data* received from the Bluetooth enabled mobile device for public or private consumption over the internet, wherein one or more portions of the new data correspond to a particular user identifier.

(*Id*. at 11:48-12:39 (emphasis supplied).) Six asserted claims (2 through 5, 7, and 9) depend on independent claim 1 and add further limitations such as when the "data signal and the new data are transferred from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device simultaneously[;]" "Bluetooth capability is provided internally in the Bluetooth enabled data capture device[;] and the "Bluetooth enabled mobile device comprises one or more of audio data, video data, image data, text data, or digital data." (*Id.* at 12:39-50 (Claim 2), 13:48-50 (Claim 7), 13:55-58 (Claim 9).)

Additionally, the '794 Patent contains two other independent claims, namely claims 6 and 16.[4] Asserted independent claim 16 of the '794 Patent is directed to transferring content from an "Internet incapable data capture device to an Internet server via separate Internet capable mobile device *by polling the Bluetooth enabled data capture device for newly captured data* within an already paired and Bluetooth connection between the data capture device and the mobile device." (Dkt No. 38, Opposition at 20-21 (citing '794 Patent at 14:14-64) (emphasis supplied).) Claim 16 has five dependent claims and adds further limitations such as when the "Bluetooth capability is provided internally in the Bluetooth enabled data capture device[;]" "Bluetooth capability is provided to the Bluetooth enabled data capture device by an external Bluetooth module[;]" and "the new data transferred from the Bluetooth enabled mobile device to one or more web services is data associated with new data." ('794 Patent at 14:65-15:14.)

//

//

---

[4] Independent claim 6 is not asserted in the above-captioned matters.

### B. The '752 Patent

Independent Claim 1 of the '752 Patent is directed to *method* of transferring data from an internet incapable data capture device to an internet server via an intermediary internet capable mobile device *by pushing event notifications within an already paired and encrypted Bluetooth connection*. (*See* '752 patent at 11:48-59.) Unlike the '794 Patent, the '752 Patent recites the use of a "secured" Bluetooth connection with a data encryption step.[5] (*Id.* at 11:51-59, 12:13-16).

### C. The '847 Patent

Independent asserted Claim 1 of the '847 Patent is directed to a *method and system* of utilizing an *encrypted, paired Bluetooth connection* to transfer data between an internet incapable data capture device and a separate internet capable mobile device. Unlike the '794 Patent, the '847 Patent recites the transfer of data by *pushing event notifications* within an already paired and encrypted Bluetooth connection. (*See* '847 Patent at 12:13-68.) Claim 1 of the '847 Patent recites the use of generic computer hardware and software, namely a "Bluetooth enabled cellular phone," "first processor," and "mobile application." (*Id.* at 12:12-13:3).

### D. The '698 Patent

Independent asserted claim 5 of the '698 Patent is directed to *system* for using an *encrypted paired short-range wireless connection* between an internet incapable *digital camera device* and a separate internet capable mobile device wherein the acquired data is transferred to the cellular phone in response to a *request initiated by the software application on the cellular phone* over an already paired and encrypted short-range wireless connection. (*See* '698 Patent at 11:56-12:25.) Independent asserted claim 1 of the '698 patent is directed to a *method* of network architecture used to implement the system recited in claim 5.

Differences between the '698 Patent and the '794 Patent include the '698 Patent's utilization of a "digital camera device" instead of a "data capture device[;]" "cellular device" instead of a "mobile device[;]" and "short-range wireless connection" instead of "Bluetooth" connection. (*Id.,* at 12:56-67.)

//

---

[5] At the hearing held on March 6, 2018, plaintiff's counsel conceded that that use of an encrypted Bluetooth connection to transfer data was conventional, well known, and not inventive.

## II. LEGAL FRAMEWORK

### A. Patent Eligibility Under § 101

The scope of subject matter eligible for patent protection is defined in Section 101 of the Patent Act: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). In applying this exception, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more." *Alice*, 134 S. Ct. at 2354 (internal quotations and alterations omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 132 S. Ct. 1289, 1301 (2012).

"The Supreme Court, setting up a two-stage framework, has held that a claim falls outside § 101 where (1) it is 'directed to' a patent-ineligible concept, *i.e.*, a law of nature, natural phenomenon, or abstract idea, and (2), if so, the particular elements of the claim, considered both individually and 'as an ordered combination, do not add enough to transform the nature of the claim into a patent-eligible application.'" *Electric Power Group, LLC v. Alstom S.A.,* 830 F.3d 1350, 1353 (Fed. Cir. 2016) (quoting *Alice* 134 S.Ct. at 2355). "The Supreme Court's formulation makes clear that the first-stage filter is a meaningful one, sometimes ending the § 101 inquiry." *Id*. (citing *Alice*, 134 S.Ct. at 2355.) "At the same time, the two stages are plainly related" in that they "involve overlapping scrutiny of the content of the claims . . . [and] there can be close questions about when the inquiry should proceed from the first stage to the second." *Id*. (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016)). The burden of establishing invalidity rests on the movant. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011) (citing 35 U.S.C.A. § 282).

Thus, in considering whether claims are patent-ineligible, the court must first determine whether the claims are directed to a patent-ineligible concept, such as an abstract idea (the "Stage-One Inquiry"). *See Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). "A principle, in the abstract, is a fundamental truth . . . [which] cannot be patented." *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) (internal citations and quotations

omitted). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Id*. To determine whether patent claims are directed to an abstract idea, the Court must "distill[] the gist of the claim[s]."[6] *Open Text S.A*, 2015 WL 269036 (N.D. Cal. 2015), at *2 (citing *Bilski v. Kappos*, 561 U.S. 593, 611-12 (2010)). A "claim directed to an abstract idea does not move into section 101 eligibility territory by 'merely requir[ing] generic computer implementation.'"*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354 (Fed. Cir. 2014) (alteration in original) (citing *Alice*, 134 S.Ct. at 2355).

If claims are directed to an abstract idea, the court must then consider whether the claims contain a sufficient "inventive concept" such that "the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself" (the "Stage-Two Inquiry"). *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) ("Distinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear."). "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (alteration in original) (internal quotations and citations omitted). Further, claims must be "directed to a 'specific means or method' for improving technology" and not "simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co., Ltd.,* 855 F.3d 1322, 1326 (Fed. Cir. 2017). For example, "when a claim directed to an abstract idea 'contains no restriction on how the result is accomplished . . . [and] [t]he mechanism . . . is not described, although this is stated to be the essential invention" then the claim is not patent-eligible. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015)).

---

[6] On the other hand, courts must be careful not to oversimplify claims because "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 134 S. Ct. at 2354; *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016).

**B. Motion to Dismiss**

Pursuant to Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed. *Id.* at 678–79. Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

C. **Judgment on the Pleadings**

The standard applied to a Rule 12(c) motion for judgment on the pleadings is "substantially identical" to the standard applied to a motion to dismiss under Rule 12(b)(6). *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). "[U]nder both rules, 'a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.'" *Id.* (quoting *Brooks v. Dunlop Mfg. Inc.*, 2011 WL 6140912, at *3 (N.D. Cal. 2011)). "If the complaint fails to articulate a legally sufficient claim, the complaint should be dismissed or judgment granted on the pleadings." *Brooks*, 2011 WL 614912 at *3. Judgment on the pleadings is appropriate "when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citing *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 979 (9th Cir. 1999)).

If a motion for judgment on the pleadings is granted, a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). However, "[a]s with a Rule 12(b)(6) motion to dismiss, a court granting judgment on the pleadings pursuant to Rule 12(c) should grant leave to amend unless it is clear that amendment would be futile." *Kelly Moore Paint Co., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2014 WL 2119996, at *3 (N.D. Cal. 2014).

**III.    DISCUSSION**

   **A.    Stage-One Inquiry: Claims Directed to an Abstract Idea?**

      **1.    Legal Standard**

At the Stage-One Inquiry, the Court must determine whether the asserted claims are directed to an abstract idea. Courts deem claims directed to "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Electric Power*, 830 F.3d at 1353 (citing *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016)); *see also Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). The use of "existing computers as tools in aid of processes focused on 'abstract ideas'" is not sufficient to remove a claim from the abstract-idea category. *Id*. (citing *Enfish*, 822 F.3d at 1335–36; *Alice*, 134 S. Ct. at 2358–59). For example, the Supreme Court in *Alice* found that claims directed to "facilitate the exchange of financial [information] between two parties by using a computer system as a third-party intermediary" were abstract. *Alice,* 134 S. Ct. at 2352. The *Alice* Court further held that "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [an abstract idea] to a particular technological environment." *Id*. at 2358 (quoting *Bilski*, 561 U.S. at 610–11); *see Parker v. Flook,* 437 U.S. 584 (1978).[7] Similarly, in *Electric Power*, the Federal Circuit "treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." *Electric Power*, 830 F.3d at 1353. The *Electric Power* Court further "recognized that merely presenting the results of abstract processes of collecting and analyzing information, without more . . . is abstract as an ancillary part of such collection and analysis." *Id*. at 1354.

By contrast, claims which "focus[] not on asserted advances in uses to which existing computer capabilities could be put, but on a specific improvement . . . in how computers could carry out one of their basic functions" may fall outside the abstract-idea category. *Electric Power*, 830 F.3d at 1354 (citing

---

[7] Plaintiffs' attempt to distinguish *Electric Power* and *TLI* on the ground that the patents at issue in those cases did not involve the use of Bluetooth technology or a paired connection does not persuade. The mere fact that the technology at issue here is different than the technology at issue in *Electric Power* and *TLI* does not necessarily render those prior cases inapposite.

*Enfish*, 822 F.3d at 1335–36 (the question is "whether the focus of the claims is on the specific asserted improvement in computer capabilities" or on computers which "are invoked merely as a tool")); *see also Alice*, 134 S.Ct. at 2358–59. However, the "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) (citing *TLI*, 823 F.3d at 612; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015)). Similarly, making a "process more efficient" in itself does not "render an abstract idea less abstract." *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017).

Ultimately, to be patentable claims must "sufficiently describe how to achieve [an improvement in computer technology] in a non-abstract way." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (finding limitations requiring "sending" and "directing" of information "d[id] not sufficiently describe how to achieve these results in a non-abstract way"); *see also Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258–59 (Fed. Cir. 2016) (holding that claims were directed to an abstract idea where they claimed "the function of wirelessly communicating regional broadcast content to an out-of-region recipient, not a particular way of performing that function"). For example, claims which recite "generalized steps to be performed on a computer using conventional computer activity" are deemed abstract. *See In re TLI*, 823 F.3d at 612 (citing *Enfish*, 822 F.3d at 1338).

### 2. Analysis of the '794 Patent

With regard to the '794 Patent, the Court finds that the asserted claims are directed to an abstract idea, namely a method of acquiring, transferring, and publishing data and multimedia content on one or more websites. *See Electric Power*, 830 F.3d at 1353; *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) (claim "directed to . . . collecting, displaying, and manipulating data" deemed abstract); *see also EasyWeb Innovations, LLC v. Twitter, Inc.,* 689 F. App'x 969, 971 (Fed. Cir. 2017) ("As we have explained in a number of cases, claims involving data collection, analysis, and publication are directed to an abstract idea."); *W. View Research, LLC v. Audi AG*, 685 F. App'x 923, 926 (Fed. Cir. 2017) ("Collecting information, analyzing it, and displaying certain results of the collection and analysis are a familiar class of claims 'directed to' a patent-ineligible concept."). The Federal Circuit "treat[s] collecting information, including when limited to particular content (which does not change its

character as information), as within the realm of abstract ideas." *Electric Power*, 830 F.3d at 1353. "[M]erely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.* at 1354. Here, the asserted claims "focus [] on the combination of . . . abstract-idea processes[,]" namely "collecting information[,]" transferring information between devices via a Bluetooth or other wireless connection, and "presenting the results" of this data collection and transfer process on one or more websites. *Id.* at 1353–54.

*TLI* is instructive. There, plaintiff asserted claims which were directed to a method of utilizing a smartphone to record and store digital images and then transfer those images to an online server for further processing. *See TLI,* 823 F.3d at 609-10. The Federal Circuit highlighted that the problem facing the inventor was "not how to combine a camera with a cellular telephone, how to transmit images via a cellular network . . . . Nor was the problem related to the structure of the server that stores the . . . digital images." *Id.* at 612. In finding the claims directed to an abstract idea, the Court held that the claims were "not directed to a specific improvement to computer functionality" but instead were "directed to the use of conventional or generic technology in a nascent but well-known environment." *Id*. As in *TLI*, the '794 Patent does do not recite a specific improvement with regard to "how to combine a camera with a cellular telephone [or] how to transmit images via a cellular network." *See id*. The '794 Patent is "not directed to a specific improvement to computer functionality" but merely utilizes generic computer hardware and software components, namely a "ubiquitous mobile phone," paired Bluetooth connection, event notifications, "fairly widespread" personal digital assistant, and "general purpose computers and computing devices" to automate the process of transmitting multimedia content from a data capture device to one or more websites. (*See* '794 Patent at 9:37–48, 10:10–13.)

Plaintiff argues that defendants attempt to oversimplify the asserted claims as covering only the abstract idea of acquiring, transferring and publishing data. According to Cellspin, the '794 Patent describes "specific improvements" in acquiring, transferring, and publishing data on the internet. However, plaintiff fails to identify these alleged "specific improvements" or otherwise explain how these improvements result in enhanced "computer capabilities" rather than "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish,* 822 F.3d at 1339.

12

Cellspin attempts to analogize to two Federal Circuit cases in arguing that the '794 Patent is direct to a specific improvement in computer capabilities, namely *Enfish* and *McRO*. The Court addresses each case.

In *Enfish*, the asserted claims were directed to a self-referential table which had a specified and nonconventional structure. *Id.* at 1338. The table "store[d] information related to each column in rows of that same table, such that new columns can be added by creating new rows in the table," as opposed to conventional tables, which "require[d] a programmer to predefine a structure and subsequent [data] entry [to] conform to that structure." *Id.* at 1337–38. As applied here, *Enfish* is distinguishable on two grounds. First, Cellspin fails to show that the data acquisition, transfer, and publication process described in the '794 Patent represents something more than a simple automation of the conventional (manual) process. As noted above, "relying on a computer to perform routine tasks more quickly or accurately is insufficient to render a patent claim eligible." *OIP Techs.*, 788 F.3d at 1363 (Fed. Cir. 2015); *see also Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*, No. 6-CV-0152, 2017 WL 1065938, at *22–23 (E.D. Tex. 2017), *report and recommendation adopted,* 2017 WL 1177988 (E.D. Tex. 2017) ("Problems such as 'substantial amount of human involvement,'" are "not the type of *true* technological problems solved by inventions held to be patent-eligible by the Federal Circuit.") (Emphasis in original.) By contrast, the claims in *Enfish* were directed to the generation of tables with self-referential functionality which tables generated pursuant to the conventional method lacked.

Second, unlike *Enfish*, the '794 Patent does not recite a "specific . . . structure" of computer components used to carry out the purported improvement in computer functionality. *Enfish,* 822 F.3d at 1337. To fall outside the abstract idea exception based on improvements to a technological process, a claim must "sufficiently describe how to achieve these results in a non-abstract way." *Two-Way Media*, 874 F.3d at 1337 (finding limitations requiring "sending" and "directing" of information "d[id] not sufficiently describe how to achieve these results in a non-abstract way"). Here, the patent states that "the method and system disclosed herein may be implemented in technologies that are pervasive [and] flexible" through generic hardware and software. ('794 Patent at 9:37-48, 10:10-13.) The asserted patent thus "fails to provide any technical details for the tangible components" and "instead predominantly describe[] the system and methods in purely functional terms" using conventional computer components and existing technology. *See TLI*, 823 F.3d at 612. The mere utilization of Bluetooth or similar wireless technology is not sufficient,

13

as the patent acknowledges that Bluetooth was a well-known means to "connect[] and exchang[e] information between devices, for example, mobile phones, laptops, personal computers (PCs), printers, digital cameras, etc." ('794 Patent at 3:49–53); *see also DIRECTV*, 838 F.3d at 1258 (finding that claims directed to establishing a communication between two points was a "broad and familiar concept concerning information distribution").

With regard to *McRO*, the patents at issue concerned a method for automating the animation of lip movement and facial expressions by replacing an animator's subjective evaluation with automated rules. *McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1305 (Fed. Cir. 2016). The *McRO* Court highlighted that the claims at issue recited "many exemplary rule sets that go beyond" merely identifying "differences in mouth positions for similar phonemes based on context" which characterized the subjective manual process. *Id*. at 1307. Further, the Court noted the lack of "evidence that the process previously used by animators is the same as the process required by the claims [at issue]." *Id.* at 1314. Specifically, the conventional process was driven by subjective human determinations "rather than specific, limited mathematical rules." *Id*. The Court thus found that the "computer is employed to perform a distinct process to automate a task previously performed by humans." *Id*. Here, by contrast, the asserted claims perform the same process of acquiring, transferring, and publishing data that humans previously performed by using existing wireless protocols and other well-known technology, albeit automatically using known computer components. (*See* '794 Patent at 1:38-47; 9:37-60.)

Accordingly, the Court finds that the claims asserted in the '794 Patent are directed to an abstract idea.

### B. Stage-Two Inquiry: Sufficient Inventive Concept?

#### 1. Legal Standard

Having determined that the claims at issue in the '794 Patent are directed to an abstract idea, the Stage-Two inquiry requires the Court to "determine whether the claim elements, when viewed individually and as an ordered combination, contain an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1373–74 (Fed. Cir. 2017); *see also BASCOM Glob; Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (stating that the "inventive concept may arise in one or more of the individual

claim limitations or in the ordered combination of the limitations"). "A claim contains an inventive concept if it 'include[s] additional features' that are more than 'well-understood, routine, conventional activities.'" *Id*. (quoting *Alice*, 134 S. Ct. at 2357, 2359). The Federal Circuit has held that "in addressing the second step of *Alice*, [] claiming the improved speed or efficiency inherent with applying the abstract idea on a computer [does not] provide a sufficient inventive concept." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). "To save a patent at step two, an inventive concept must be evident in the claims." *Two-Way Media*, 784 F.3d at 1338 (citing *RecogniCorp,* 855 F.3d at 1327).

### 2. Analysis of the '794 Patent

Turning to the '794 Patent, the Court finds that the asserted claims "merely provide a generic environment in which to carry out" the abstract ideas of acquiring, transferring, and publishing data. *TLI*, 823 F.3d at 611. The claim elements thus fail to supply an inventive concept sufficient to transform the underlying abstract idea into patentable subject matter. As the Federal Circuit explained in *DIRECTV*, claims which "recite the use of generic features of" hardware and software components "as well as routine functions, such as transmitting and receiving signals to implement the underlying idea" do not contain a sufficient inventive idea. *DIRECTV*, 838 F.3d at 1262.

Here, the "recited physical components[,]" namely a data capture device, paired Bluetooth connection, and a Bluetooth enabled mobile device, "behave exactly as expected according to their ordinary use." *TLI*, 823 F.3d at 615. A patent "does not become nonabstract" merely because the claims are set in a "technological environment" consisting of conventional components and utilize standard technology. *See Symantec*, 838 F.3d at 1319; *see also Alice*, 134 S. Ct. at 2358. The Federal Circuit has "repeatedly held that such invocations of computers and networks that are not even arguable inventive are insufficient to pass the test of an inventive concept."[8] *Electric Power*, 830 F.3d at 1455-56.

Cellspin counters that the Asserted Patents present several "benefits from the inventiveness of the claimed technology" including:

---

[8] Cellspin's argument that the Asserted Patents are novel and non-obvious is not relevant to the Section 101 analysis. *See Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981) ("The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter.").

15

> (1) the efficiencies of the claimed inventions, including over inferior alternative means for achieving the same or similar ends of uploading content; (2) leveraging Internet capabilities of mobile devices (through use of custom hardware and software) to greatly enhance the functionality of Internet incapable data capture devices; (3) uploading captured data from data capture devices to the Internet while avoiding the cost, memory usage, complexity, hardware (e.g., cellular antenna), physical size, and battery consumption of an Internet accessible mobile device, including without the data capture device being capable of wireless Internet connections or being capable of communicating in Internet accessible protocols such as HTTP; (4) minimizing power usage by the data capture device, including to minimize the need to change batteries or recharge the device; (5) using event notification, polling and request/return communication protocols over an already paired connection to have the benefits from an efficient or automated upload system while conserving resources such as batteries by avoiding the data capture device broadcasting captured data when an intermediate mobile device is unavailable (*e.g.*, off or out of Bluetooth range) or incapable of receiving captured data for uploading to the Internet; and (6) applying HTTP in transit and on intermediary device.

(Opposition at 24.) Plaintiff does not persuade. As an initial matter, the Court notes that only the first purported benefit, namely efficiencies for achieving "the same or similar ends of uploading content" as the conventional method, appears in the specification of the '794 Patent. With regard to this purported benefit, a method which utilizes known and conventional computer components to achieve an improvement in the efficiency or speed of a previously-manual process does not constitute a sufficient inventive concept. *See OIP Techs.*, 788 F.3d at 1363; *see also Capital One Bank*, 792 F.3d at 1367; *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1267 (Fed. Cir. 2012) ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.").

The other proffered benefits which relate to improved battery consumption and power savings; order or timing of the Bluetooth wireless pairing; and elimination of the need for bulky hardware and costly cell phone services;[9] do not appear in the patent's specification. In *TLI*, the Federal Circuit rejected plaintiff's

---

[9] Plaintiff relies on *DDR* in arguing that the '794 Patent is patent eligible because "claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR*, 773 F.3d at 1257. However, plaintiff ignores the language in *DDR* which specifically "caution[ed]" that "not all claims purporting to address Internet-centric challenges are eligible for patent." *Id*. 1258.

proffer of technological improvements which did not appear in the asserted patent's specification, holding that the court "need [] only look to the specification, which describes the [components] as either performing basic computer functions such as sending and receiving data, or performing functions 'known' in the art." *TLI*, 823 F.3d at 612; *see also Cellular Commc'ns Equip. LLC v. AT&T Inc.*, 2017 WL 2984074, at *4 n.1 (E.D. Tex. 2017) (rejecting argument that a feature was inventive where the specification did not "reflect such an insight"). Cellspin argues that these benefits "flow from" the '794 Patent but fails to identify any specific section of the patent from which these benefits flow or articulate how these purported benefits "flow from" the patent.[10]

Plaintiff's amended complaints do not change this conclusion. (Dkt. No. 58, Amended Complaint.) As an initial matter, the Court notes that most of plaintiff's allegations regarding technological improvements fail to cite to support in the '794 Patent. (*Id*. at ¶¶ 13, 15, 17, 18, 19.) Further, where plaintiff does cite to the patent these citations do not appear to support plaintiff's arguments. For example, the amended complaint alleges that the Asserted Patents "improved . . . prior computer and networking technology" by "[m]inimizing power usage by the data capture device, including [minimizing] the need to charge batteries or recharge the device." (*Id*. at ¶ 19(d) (citing '794 Patent at 4:66-5:1).) However, the cited section of the '794 Patent does not reference power usage or battery savings, much less support plaintiff's allegation of improvements to the same:

> By implementation of a handshake protocol, the BT communication device []
> automatically transfers captured data, the multimedia content, and the associated files to
> the client application [] on the mobile device []. For some external digital data capture
> devices, the client application [] may not be able to detect the creation of a new file. In
> such cases, the digital data capture device [] signals the client application [] in the event a
> new file is created. **A file event listener in the client application [] listens for the
> signal from the digital data capture device []. The user may then initiate the transfer
> by a press of a button or a key on the digital data capture device** [].

---

[10] In any event, the specification acknowledges that Bluetooth was used in the prior art to "connect[] and exchang[e] information between devices, for example, mobile phones, laptops, personal computers (PCs), printers, digital cameras, etc." ('794 Patent at 3:49-52.) With regard to the timing of the Bluetooth wireless paring, "there is nothing 'inventive' about shifting the timing of the data collection process." *In re: Bill of Lading Transmission & Processing Sys. Patent Litig.,* 2016 WL 4505767, at *3 (S.D. Ohio 2016).

(*Id*. at 4:55-5:1 (portions cited by plaintiff in bold).) Again, the alleged technological improvements appear nowhere in the claims or specification and plaintiff fails to explain how such benefits otherwise "flow from" the patent. Similarly, plaintiff's amended complaint alleges that the asserted claims "conserve[] resources such as batteries." (Amended Complaint ¶ 19(e) (citing '794 Patent at 4:55-5:3 and 5:12-17).) However, the cited sections do not discuss resource conversation or batteries.[11] (*See* '794 patent at 4:55-5:3 and 5:12-17.) In the same vein, the specification does not support Cellspin's allegations regarding improved cost benefits.[12]

**C.     The '752, '847, and '698 Patents**

With regard to the '752, '847, and '698 Patents, the Court finds that each of the Asserted Patents is directed to substantially similar abstract idea, namely a method for capturing, transferring and publishing data and multimedia content. Specifically, each patent recites the use of a Bluetooth enabled data capture device or digital camera device to transfer data to a Bluetooth enabled mobile device which in turn publishes the data on one or more websites automatically or with minimal user intervention. (*See* '752 Patent at 11:48-12:38; '847 Patent at 12:13-13:3; '698 Patent at 11:54-12:28.) Where all of the asserted patent claims

---

[11] The term "battery" does appear in any of the Asserted Patents.

[12] Plaintiff also relies on *Berkheimer* in arguing that this Court should deny defendants' motions because "the question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field . . . . must be proven by clear and convincing evidence." *Berkheimer v. HP, Inc.*, 881 F.3d 1360 (Fed. Cir. Feb. 2018). Here the Court need not reach the issue in the manner suggested given the analysis performed under the two-stage test. *Berkheimer* addressed a defendant's burden at the summary judgment stage, not in the context of a motion to dismiss. In any event, *Berkheimer* is distinguishable on that ground that the patent at issue there "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner" whereas here Cellspin fails to identify any portion of the specification which describes the purportedly inventive power usage, battery savings, resource conservation, or cost benefits. *Id*.

With respect to the Amended Complaint, the Court notes that the plaintiff did not file the same until two business days before the hearing on these motions. Accordingly, at oral argument having heard from plaintiff, the Court allowed defendants to respond in writing on the impact of plaintiff's filing. Thereafter, without requesting permission, plaintiff filed a response in violation of the procedures set forth in the Local Rules. The Court issued an Order to Show Cause ("OSC") regarding the same. In light of the Court's ruling herein, the Court **GRANTS** permission for the filing *nunc pro tunc,* **DISCHARGES** the OSC and cautions plaintiff to follow the rules of the Court or risk sanctions for failure to do so. (Dkt. Nos. 74, 75.)

18

are "substantially similar and linked to the same abstract idea[,]" the Court need not "expressly address each asserted claim" in determining whether the claims are patent eligible under Section 101. *TS Patents LLC v. Yahoo! Inc.,* 279 F. Supp. 3d 968, 988 (N.D. Cal. 2017); *see also Content Extraction*, 776 F.3d at 1348 (finding that the district court "correctly determined that addressing each claim of the asserted patents was unnecessary" because "all the claims are 'substantially similar and linked to the same abstract idea'").) Here, all Asserted Patents are "substantially similar and linked to the same abstract idea" of acquiring, transferring, and publishing data on the internet. *See id.*

Further, plaintiff fails to offer any argument or authority as to why the differences between the '794 Patent and the '752 (pushing event notifications within an already paired and encrypted Bluetooth connection); '847 (utilizing an encrypted, paired Bluetooth connection; pushing event notifications within an already paired and encrypted Bluetooth connection); and '698 Patents (utilizing an encrypted paired short-range wireless connection between a mobile device and incapable digital camera device) represent an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Smart Sys. Innovations*, 873 F.3d at 1373–74; *see also BASCOM*, 827 F.3d at 1350.

The Court thus finds the '794 Patent is representative of all Asserted Patents. Accordingly, the Court finds that the '752, '847, and '698 Patents are not patent eligible.

**IV.  CONCLUSION**

Having carefully reviewed the pleadings, the papers and exhibits submitted on this motion, the parties' arguments at the hearing held on March 6, 2018, and for the reasons set forth above, the Court **GRANTS** the Omnibus Defendants' motion to dismiss and **GRANTS** Garmin's motion for judgment on the pleadings.

Defendants shall file a proposed order of judgment approved as to form within five (5) days for each of the captioned matters.

**IT IS SO ORDERED.**

Dated: April 3, 2018

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**