# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CELLSPIN SOFT, INC.,<br><br>       Plaintiff,<br><br>v.<br><br>FITBIT, INC.,<br><br>       Defendant. | CLAIM CONSTRUCTION ORDER<br><br>Case No. 17-cv-05928-YGR<br><br>Dkt. No. 148 |
| v.<br><br>MOOV, INC.,<br><br>       Defendant. | Case No. 17-cv-05929-YGR<br><br>Dkt. No. 130 |
| v.<br><br>NIKE, INC.,<br><br>       Defendant. | Case No. 17-cv-05931-YGR<br><br>Dkt. No. 128 |
| v.<br><br>UNDER ARMOUR, INC.,<br><br>       Defendant. | Case No. 17-cv-05932-YGR<br><br>Dkt. No. 110 |
| v.<br><br>FOSSIL GROUP, INC., ET AL.,<br><br>       Defendants. | Case No. 17-cv-05933-YGR<br><br>Dkt. No. 193 |
| v.<br><br>GARMIN INTERNATIONAL, INC., ET AL.,<br><br>       Defendants. | Case No. 17-cv-05934-YGR<br><br>Dkt. No. 130 |
| v.<br><br>NIKON AMERICAS, INC., ET AL.,<br><br>       Defendants. | Case No. 17-cv-05936-YGR<br><br>Dkt. No. 135 |

United States District Court
Northern District of California

Plaintiff Cellspin Soft, Inc. ("Cellspin") brings these seven patent infringement actions[1] against defendants Fitbit, Inc., Moov, Inc., Nike, Inc., Under Armour, Inc., Fossil Group, Inc., Misfit Inc., Garmin International, Inc., Garmin USA Inc., Nikon Inc., and Nikon Americas, Inc. (collectively, "Defendants") for infringement of U.S. Patent Nos. 8,738,794 (the "'794 Patent"), 8,892,752 (the "'792 Patent"), and 9,749,847 (the "'847 Patent").

Having carefully considered the papers submitted, the parties' arguments presented at the claim construction hearing on March 5, 2021, and the pleadings in this action, and for the reasons set forth below, the Court hereby adopts the claim constructions set forth herein.

## I.  BACKGROUND

### A.  Patents At Issue

The '794, '752, and '847 Patents share the same specification and are each directed to distribution of multimedia content (e.g., publishing a photo on social media).  (*See* '794 Patent at 1:32-36.)  According to the specification, distributing multimedia content before the inventions was cumbersome.  A user would capture the image using a separate device, such as a camera, and then manually transfer the photo to an internet-capable device, such as a personal computer, using a USB or memory stick.  (*Id*. at 1:37-45.)  The user would then manually upload the image to a website, which "takes time and may be inconvenient."  (*Id*. at 1:45-47.)

To reduce this inconvenience, the asserted patents automate the process.  (*See id*. at 1:33-36, 1:48-54, 1:64-2:3.)  In place of a manual connection, the data capture and publishing devices are connected via a paired, wireless Bluetooth connection.  (*Id*. at 2:10-14.)  The publishing device is a mobile phone that has a software application, which automatically detects the presence of new data on the data capture device and transfers it to the mobile device.  (*Id*. at 2:4-5, 2:18-25.)  The transfer may be initiated by either the mobile device, in a "pull" mode, or by the data capture

---

[1] Seven other patent infringement actions were initially filed and subsequently dismissed or stayed pending *inter partes* review.  *See* Case Nos. 17-5930, 17-5937, 17-4938, 17-5939, 17-5941, 17-6881, 20-3673.  Cellspin filed its claim construction brief in case number 17-cv-5928 only (Dkt. No. 153), while Defendants filed their responsive brief in case number 17-cv-5933 only (Dkt. No. 207.)  Unless otherwise noted, all docket citations refer to case number 17-cv-5933 (*Cellspin Soft, Inc. v. Fossil Group Inc.*).

United States District Court
Northern District of California

device, in a "push" mode.  (*Id*. at 2:26-34, 4:27-38, 4:55-5:5.)  The mobile device automatically publishes the new content to one or more websites through the application.  (*Id*. at 2:35-54.)

Claim 1 of the '794 Patent recites:

A *method* for acquiring and transferring data from a Bluetooth enabled data capture device to one or more web services via a Bluetooth enabled mobile device, the method comprising:

> *providing a software module* on the Bluetooth enabled data capture device;

> *providing a software module* on the Bluetooth enabled mobile device;

> *establishing a paired connection* between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device;

> *acquiring new data* in the Bluetooth enabled data capture device, wherein new data is data acquired after the paired connection is established;

> *detecting and signaling the new data for transfer* to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer *comprises*:

>> *determining the existence of new data* for transfer, by the software module on the Bluetooth enabled data capture device; and

>> *sending a data signal* to the Bluetooth enabled mobile device, corresponding to existence of new data, by the software  module on the Bluetooth enabled data capture device automatically, over the established paired Bluetooth connection, wherein the software module on the Bluetooth enabled mobile device listens for the data signal sent from the Bluetooth enabled data capture device, wherein if permitted by the software module on the Bluetooth enabled data capture device, the data signal sent to the Bluetooth enabled mobile device comprises a data signal and one or more portions of the new data;

> *transferring the new data* from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device automatically over the paired Bluetooth connection by the software module on the Bluetooth enabled data capture device;

3

*receiving*, at the Bluetooth enabled mobile device, *the new data* from the Bluetooth enabled data capture device;

*applying*, using the software module on the Bluetooth enabled mobile device, *a user identifier to the new data for each destination web service*, wherein each user identifier uniquely identifies a particular user of the web service;

*transferring the new data* received by the Bluetooth enabled mobile device along with a user identifier *to the one or more web services*, using the software module on the Bluetooth enabled mobile device;

*receiving, at the one or more web services, the new data and user identifier* from the Bluetooth enabled mobile device, wherein the one or more web services receive the transferred new data corresponding to a user identifier; and

*making available, at the one or more web services, the new data* received from the Bluetooth enabled mobile device for public or private consumption over the internet, wherein one or more portions of the new data correspond to a particular user identifier.

Claim 16 of the '794 Patent is identical, but recites a different "detecting" step:

*detecting the new data* for transfer to the Bluetooth enabled mobile device, wherein detecting the new data for transfer comprises:

*polling the Bluetooth enabled data capture device* using the software module on the Bluetooth enabled mobile device over the established paired Bluetooth connection, wherein the Bluetooth enabled data capture device listens for the polling request sent from the Bluetooth enabled mobile device; and

*determining the existence of new data for transfer*, by the software module on the Bluetooth enabled data capture device;

Claim 1 of the '752 Patent recites:

*A method for transferring data* from a Bluetooth enabled data capture device to a remote internet server via a Bluetooth enabled mobile device comprising:

*performing* at the Bluetooth enabled data capture device:

*establishing a secure paired Bluetooth connection* between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device, wherein the secure paired Bluetooth connection uses a cryptographic encryption key;

*acquiring new data* in the Bluetooth enabled data capture device, wherein new data is data acquired after the secure paired Bluetooth connection is established;

*detecting and signaling the new data for transfer*, to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer comprises:

> *receiving a message* from the Bluetooth enabled mobile device, over the established secure paired Bluetooth connection, *to enable event notifications*, corresponding to new data for transfer, on the Bluetooth enabled data capture device;

> *enabling event notification* on Bluetooth enabled data capture device, corresponding to new data for transfer;

> *determining existence of the new data* for transfer; and

> *sending an event notification to* the Bluetooth enabled mobile device, corresponding to existence of new data for transfer, over the established secure paired Bluetooth connection, wherein the Bluetooth enabled mobile device is configured to listen for the event notification sent from the Bluetooth enabled data capture device;

*encrypting*, using the cryptographic encryption key, *the new data* acquired in the Bluetooth enabled data capture device; and

*transferring the encrypted data* from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device, over the established secure paired Bluetooth connection, wherein the Bluetooth enabled mobile device has access to the internet, wherein the Bluetooth enabled mobile device is configured to receive the encrypted data and obtain the new data from the encrypted data using the cryptographic encryption key, wherein the Bluetooth enabled mobile device is configured to *attach a user identifier, an action setting and a destination web address of a remote internet server to the obtained new data*, wherein the user identifier uniquely identifies a particular user of internet service provided by the remote internet server, wherein *action setting comprises one of a remote procedure call (RPC) method and hypertext transfer protocol (HTTP) method*, and wherein the Bluetooth enabled mobile device is configured to send the obtained new data with the attached user identifier, an action setting and a destination web address to a remote internet server.

Last, claim 1 of the '847 Patent recites:

A *system* comprising:

> a Bluetooth enabled *data capture device*, comprising:

a first *memory* device;

a first *processor* coupled to the first memory device;

a first Bluetooth *communication device* configured to establish a paired Bluetooth wireless connection between the Bluetooth enabled data capture device and a Bluetooth enabled cellular phone, wherein the Bluetooth enabled data capture device is configured to cryptographically authenticate identity of the Bluetooth enabled cellular phone when the first Bluetooth communication device establishes the paired Bluetooth wireless connection;

a *data capture circuitry*;

said first processor *configured to acquire new-data* using the data capture circuitry after the paired Bluetooth wireless connection between the Bluetooth enabled data capture device and the Bluetooth enabled cellular phone is established;

said first processor *configured to store the acquired new-data* in the first memory device; and said first processor configured to send an event notification and the acquired new-data to the cryptographically authenticated Bluetooth enabled cellular phone over the established paired Bluetooth wireless connection, wherein the event notification corresponds to the acquired new-data and comprises sending a signal to the cryptographically authenticated Bluetooth enabled cellular phone;

a *mobile application* in the Bluetooth enabled cellular phone comprising executable instructions that, when executed by a second processor inside the Bluetooth enabled cellular phone controls the second processor to:

detect and receive the acquired new-data, comprising:

*listen for the event notification*, sent from the Bluetooth enabled data capture device, over the established paired Bluetooth wireless connection, wherein the event notification corresponds to the acquired new-data; and

*receive the event notification and the acquired new-data*, from the Bluetooth enabled data capture device, over the established paired Bluetooth wireless connection, wherein receiving the event notification comprises receiving the signal sent by the Bluetooth enabled data capture device corresponding to the acquired new-data;

*store the new-data* received over the established paired Bluetooth wireless connection, in a second memory device of the Bluetooth enabled cellular phone before transfer to a website; and

*use HTTP to transfer the new-data* received over the established paired Bluetooth wireless connection, along with user information stored in the second memory device of the cryptographically authenticated Bluetooth enabled cellular phone, to the website, over the cellular data network;

wherein the mobile application further comprises executable instructions to control the processor to *provide a graphical user interface (GUI) for the new-data.*

## II.   LEGAL STANDARD

Claim construction is a question of law for the court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996).  "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  During claim construction, the court must "fully resolve[]" the parties' disputes over claim scope and assign "a fixed, unambiguous, legally operative meaning to the claim."  *Every Penny Counts, Inc. v. American Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009).

Claim terms are generally given the "ordinary and customary meaning" that they would have to a person of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  The ordinary and customary meaning is not the meaning of the claim term in the abstract.  *Id.* at 1313, 1321.  Rather, it is "the meaning to the ordinary artisan after reading the entire patent."  *Id.*; *see also Trs. of Columbia U. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("The only meaning that matters in claim construction is the meaning in the context of the patent.").

To determine the ordinary meaning, the court examines the claims, specification, and prosecution history of the patent, which form the "intrinsic evidence" for claim construction.  *Phillips*, 415 F.3d at 1313-17; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "[T]he context in which a term is used in the asserted claim can be highly instructive."  *Phillips*, 415 F.3d at 1314.  Additionally, "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms."  *Id.*  However, a person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.  The specification "is always highly relevant to the claim construction analysis" and usually "dispositive."  *Id.* at 1315 (citation omitted).  Nevertheless, it is improper to import limitations from the specification unless the patentee has demonstrated a clear intent to limit claim scope.  *Martek Biosci. Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009).

United States District Court
Northern District of California

In addition to the claims and specification, the prosecution history may be used "to provide[] evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described and patented." *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (citation omitted). Finally, a court may consider extrinsic evidence—such as dictionaries, inventor testimony, and expert opinion—if it is helpful. *Phillips*, 415 F.3d at 1319. However, extrinsic evidence "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id*.

There are two exceptions to the ordinary meaning construction: "1) when a patentee sets out a definition and acts as his own lexicographer," and "2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitronics*, 90 F.3d at 1580). To act as a lexicographer, the patentee "must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id*. (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). To disavow claim scope, the specification or prosecution history must "make[] clear that the invention does not include a particular feature" even though the language of the claims "might be considered broad enough to encompass the feature in question." *Id*. at 1366 (citation omitted). The disclaimer must be "clear and unmistakable." *Comp. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008). The totality of the prosecution history informs the disavowal inquiry. *Id*. at 1379.

## II.   ANALYSIS

### A.   Agreed-To Constructions

The parties propose ten claim terms for construction, claiming that they were not able to agree on any of them.[2] (*See* Dkt. No. 192 ("Claim Construction Statement") at 1.) As revealed at

---

[2] A number of the terms are compound, so the actual number is greater than ten. (*See, e.g.*, Claim Construction Statement at 13-14.) As noted at the hearing, many of these disputes could have been resolved without briefing through a meaningful meet-and-confer process.

the hearing for this motion, however, many of the disputes are not genuine.  In particular, the Court notes that the following issues are not disputed:

- With the exceptions discussed below, the claim limitations must be performed in order for an individual bit of data.  However, the process as a whole need not be complete at one step for all data before the system moves on to the next step.  (*See* Dkt. No. 149 ("Tr.") at 26:12-8, 28:6-17.)

- The claimed "Bluetooth enabled data capture device" is separate and apart from the mobile device and has the ability to send and/or receive Bluetooth wireless messages.  (*Id*. at 23:12-24:16.)

- The claimed "secured paired Bluetooth connections" implements one or more Bluetooth security methods.  (*Id*. at 61:4-62:22.)

- "Applying" and "attaching" have the same meaning in the context of the claims. (*Id*. at 68:22-70:8.)

Claim construction "is not an obligatory exercise in redundancy."  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope to clarify and when necessary to explain what the patentee covered by the claims, for use in determination of infringement."  *Id*.  Here, the claim terms described above are clear and easy for a jury to understand.  Because their meaning is not actually disputed, the Court does not construe them further here.  *See O2 Micro*, 521 F.3d at 1361.

**B.**     **Temporal Order (All Asserted Claims)**

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| No temporal restriction unless stated so in the claim language | The elements are limited to the specific order in which they appear in the claims | The elements must be performed in the order they appear in the claims, with the following exceptions:<br><br>1. "Providing a software module" in the '794 Patent can occur in any order before the "detecting and signaling" step.<br><br>2. Sending a "data signal" |

United States District Court
Northern District of California

| | | in claim 1 of the '794 Patent can occur simultaneously with transferring new data. |
| | | 3. Claim 1 of the '847 Patent requires an order only for elements following the terms "configured to" and "controls to." |

The parties first dispute whether the asserted claims require a particular temporal order (i.e., whether some limitations must be satisfied before others). In their initial briefs, the parties staked out extreme positions on this issue, while acknowledging possible exceptions. Cellspin argued that a temporal order is not required unless expressly stated in the claims, but failed to identify limitations for which that is the case. Defendants argued that a temporal order is required, but acknowledged exceptions for providing software modules in claim 1 of the '794 Patent.[3] The Court sought to ascertain the scope of the actual dispute at the hearing, and Cellspin could only identify the following limitations that it contends may be performed out-of-order:

- "Encrypting" does not have to occur before "signaling" in claim 1 of the '752 Patent.
- Transferring the data signal and new data can occur simultaneously in claim 3 (and claim 1, on which it depends) of the '794 Patent.
- "Storing" does not have to occur before "sending" in claim 1 of the '847 Patent.

(Tr. at 30:8-33.12.)

Because these specific disputes were not briefed, the Court ordered supplemental briefing to address the issues specifically. (*Id.* at 33:25-34:25.) Cellspin submitted a supplemental brief identifying *twenty-eight* instances where it contends the claims do not require an order, without substantive argument or explanation. (*See* Dkt. No. 182 at 2-6.) These arguments are improper: the Court specifically asked Cellspin to identify "the totality" its argument at the hearing, and

---

[3] *See* '794 Patent at claim 1 ("providing a software module on the Bluetooth enabled data capture device," "providing a software module on the Bluetooth enabled mobile device").

United States District Court
Northern District of California

Cellspin limited its argument to the three limitations described above. (*See* Tr. at 30:19-31:2.) This is yet another example of Cellspin's repeated attempt to ever expand the scope of the patent and disregard the courts' rules regarding disclosures to facilitate the orderly resolution of patent claims. Permitting Cellspin to raise additional disputes now would require additional briefing to allow Defendants to respond months after Cellspin refused to identify the limitations that it contends form the exception to the requirement of temporal order. Such conduct cannot be countenanced by busy federal courts. Moreover, the sheer number of issues raised by Cellspin far exceeds the ten terms permitted for claim construction by this Court's standing order and demonstrates that Cellspin has not narrowed the issues to those that matter for case resolution.

Accordingly, the Court holds Cellspin to its word: the claim limitations must be performed in order with the exceptions discussed below; all other arguments are stricken. *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1376 (Fed. Cir. 2015) (no error to hold parties to the constructions they agreed to previously); *see also SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005) (no abuse of discretion in refusing to entertain untimely claim construction arguments in violation of local rules).[4] The possible exceptions are addressed below.

### 1. *Encrypting Before Signaling*

Claim 1 of the '752 Patent recites (1) "acquiring new data in the Bluetooth enabled data capture device," (2) "detecting and signaling the new data for transfer," (3) "encrypting . . . the new data," and (4) "transferring the encrypted data from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device." ('752 Patent at claim 1.) Defendants argue that these steps must be performed in order as a matter of logic: new data cannot be detected on a device until it has been acquired, cannot be encrypted until it has been detected, and cannot be transferred in an encrypted form until it has been encrypted. Cellspin argues otherwise, contending that

---

[4] The Court recognizes that methods steps ordinarily do not require an order. *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014). In this case, however, Cellspin concedes that the claims require an order for some limitations, but has refused to identify them or the exceptions with particularity.

United States District Court
Northern District of California

United States District Court
Northern District of California

encryption can occur at any time following "acquiring new data" and "transferring the encrypted data," but provides no evidence or explanation in support.  (*See* Dkt. No. 182 at 3:8-10.)

Because the Court agrees that data cannot be encrypted by the data capture device until the device detects its presence, the steps must be performed in order.[5]  *See Mformation*, 764 F.3d at 1398 (construing claims to require an order where doing otherwise would be illogical).

### 2.   *Sending a Data Signal Before Transferring New Data*

Claim 1 of the '794 Patent recites limitations similar to those of the '752 Patent, where the "detecting and signaling the new data" step comprises (1) "determining the existence of new data for transfer" and  (2) "sending a data signal to the . . . mobile device."  ('794 Patent at claim 1.) Defendants argue that both steps must be complete before the new data can be transferred to the mobile device.  They concede, however, that the two steps can occur simultaneously—i.e., that the signal can be sent "at the same time" as the new data.  (Dkt. No. 227 at 4:23-26.)  Indeed, claim 3 expressly requires the data signal and data to be transferred "simultaneously," and claim 1 states that "if permitted by the software module on the Bluetooth enabled data capture device, the data signal sent to the Bluetooth enabled mobile devices comprises a data signal *and* one or more portions of the new data."  ('794 Patent at claims 1, 3 (emphasis supplied).)

Accordingly, because this interpretation is not genuinely disputed and is supported by the intrinsic evidence, the Court construes the claims to allow a data signal to be sent simultaneously with new data.

### 3.   *Storing Before Sending*

Claim 1 of the '847 Patent recites a system comprising components, including a first processor (on a data capture device) and a second processor (on a cellular phone).  ('847 Patent at claim 1.)  The first processor is "configured" to "acquire new-data," "store the acquired new data," and "send . . . the acquired new-data" to the cellular phone.  (*Id*.)  The second processor executes a

---

[5] Cellspin also claims that the sub-steps related to enabling event notifications can be performed apart from detecting and signaling new data.  Again, however, it provides no evidence or argument in support and did not raise this argument at the hearing.  The claim recites enabling event notifications as part of the "detecting and signaling" step (which "comprises" those steps) and must therefore be performed between the data acquisition and new data detection steps.

1    "mobile application" that "controls" the second processor to execute a reciprocal method,

2    including to "receive . . . the acquired new data," "store the new data received," and "transfer the

3    new data . . . to the website."  (*Id*.)

4         Defendants argue that in both of these cases, storing must occur before sending or

5    transferring data.  Although Cellspin counters that an order cannot be read into a system claim,

6    courts have permitted such ordering when the claim language requires it.  *See Avago Techs. Gen.*

7    *IP (Singapore) Pte Ltd. v. Asustek Computer, Inc.*, No. 15-CV-04525-EMC, 2016 WL 3029674, at

8    *12 (N.D. Cal. May 27, 2016) (collecting cases).  Here, the Court agrees that an order is required

9    by the language of the claims for the storing and sending limitations.

10        With respect to the first processor, the claims expressly require configuration to store "*the*

11   *acquired* new data."  The antecedent basis for the new data is plainly the data the processor

12   previously acquired.  A contrary interpretation would be nonsensical as referring to stored data as

13   "acquired" prior to its acquisition.  Similarly, with respect to the second processor, the claims

14   expressly require the second processor to "store the new data . . . before transfer to a website."

15   There is therefore no basis to construe these terms to occur in any order.  Cellspin disagrees but,

16   again, provides no evidence or argument for its contrary interpretation.  (*See* Dkt. No. 182 at 5.)

17        Nevertheless, the Court agrees that the limitations that merely recite the components of a

18   system ("a first memory device," data capture circuitry," etc.) or generic configuration need not be

19   included in the system in the stated order.  Accordingly, the Court construes the two "store"

20   limitations in claim 1 of the '847 Patent to take place before the "send" and "transfer" limitations.

21        **C.      "new data is data acquired after the paired connection is established" (Claims**
            **1 and 16 of the '794 Patent; Claim 12 of the '752 Patent; Claim 1 of '847**
22          **Patent)**

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning, where "after" means "subsequent to" | "[configured such that] new data can only be acquired during the paired connection that is established and maintained on a continuous basis" | "after the paired connection is established" means "after the paired connection is established and maintained on a continuous basis." |

United States District Court
Northern District of California

United States District Court
Northern District of California

1      The independent claims of the asserted patents require acquiring "new data," where "new

2  data" is defined as "data acquired after the paired connection is established." (*See* '794 Patent at

3  claims 1, 16; *see also* '752 Patent at claim 12 (similar), '847 Patent at claim 1 (reciting a first

4  processor "configured to acquire new data . . . after the paired Bluetooth wireless connection . . . is

5  established"). The parties dispute whether the paired connection must be maintained on a

6  "continuous basis" while data is acquired. Defendants argue that it does because the phrase "is

7  established" refers to the present, rather than the past, while Cellspin contends that it does not

8  because "after" simply means "subsequent to."[6]

9      Regardless of the plain meaning of the claims, however, prosecution disclaimer limits the

10  term to maintaining continuous paired connections while new data is acquired in this case. During

11  prosecution of the '794 Patent, Cellspin added the limitation in question in order to overcome

12  prior art. (*See* Dkt. No. 217-2 ("'794 Patent Prosecution History") at 3.) The examiner rejected

13  the unamended claims over a "Kennedy" reference, which disclosed uploading new data in one of

14  three ways: (1) automatically, upon sensing that the device is full, (2) manually, when the user

15  decides to perform the transfer, or (3) in real-time, as soon as data is acquired. (*See id.* at 19.)

16  Cellspin argued that Kennedy did not disclose whether the connection is opened before or after the

17  data acquisition and whether it is closed or kept open after data transfer. (*Id.*) It later clarified that

18  Kennedy took the conventional approach of disconnecting the paired connection after data transfer

19  to save power, while the patent "took the opposing view," which is "to . . . maintain the BT paired

20  connection *on a continuous basis* for the application" and "not to disconnect the BT paired

21  connection after the transfer of data." (*Id.* at 59 (emphasis supplied).) The reason for this

22  approach was a belief "that having a constant connection would be the key to the overall

23  improvement in the application architecture and responsiveness of the application." (*Id.*)

24      The Court finds that the above statements constitute clear and unambiguous disclaimer of

25  paired connections that are not maintained on a continuous basis. *Aylus Networks, Inc. v. Apple*

26

27        [6] Cellspin also cites an unrelated part of the specification, which refers to publishing
images on the website "after" the captured image is transferred. (*See* '794 Patent at 8:52-55.) The
28  relevance of these is limited, but, in any case, cannot overcome the clear disclaimer in this case.

United States District Court
Northern District of California

*Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017). Cellspin had "unequivocally and unambiguously" disavowed systems that fail to maintain a continuous paired connection, characterizing this feature as "key" to the improvements of the invention, and cannot now interpret the claims to cover such systems. *See id*. Moreover, because the '794 Patent is related to the other asserted patents, the disclaimer extends to all asserted patents having this limitation.[7] *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004).

Accordingly, the Court construes "after the paired connection is established" as "after the paired connection is established and maintained on a continuous basis." However, there is no basis to adopt Defendants' additional construction precluding acquisition of other types of data (i.e., data that is not the claimed "new data") independent of pairing. The claims here all use the open-ended "comprising" term and thus allow for additional limitations.

**D.      "Bluetooth" (All Asserted Claims)**

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | Bluetooth System Version 2.1+EDR (26 July 2007), Volumes 0 to 4, or a prior version of this standard | No construction<br><br>(Not limited by version.) |

The parties dispute several phrases in the Asserted Patents related to Bluetooth, including "Bluetooth enabled data capture device" in the '794 Patent and "secured paired Bluetooth connection" in the '752 Patent. As explained above, only the term "Bluetooth" is genuinely disputed in these terms. Defendants seek to limit Bluetooth the versions available at the time of the invention or earlier, while Cellspin contends that no such limitation is necessary.

Generally, claims are construed to have the meaning that they would have had to a person of ordinary skill in the art at the time of the invention. *See Phillips*, 415 F.3d at 1313. A number

---

[7] As Defendants point out, Cellspin made similar arguments related to a "permanent" paired wireless connection during prosecution of the '847 Patent, which further confirms the common understanding of this term in all patents. (*See* Dkt. No. 217-4 ("'847 Patent Prosecution History") at 20.)

of courts have interpreted this rule to require limiting claim terms reciting a technical standard to the versions available at the time of the invention. *See Fundamental Innovation Sys. Int'l LLC v. Samsung Elecs. Co., Ltd.*, No. 17-cv-145, 2018 WL 647734, at *6-12 (E.D. Tex. Jan. 31, 2018) (construing term "USB" as "limited to the Universal Serial Bus standards that existed at the time of the claimed invention"); *Chrimar Sys., Inc. v. Alcatel-Lucent USA, Inc.*, 6:15-cv-163-JRG-JDL, 2016 WL 1228767, *8-9 (E.D. Tex. Mar. 28, 2016) (limiting "BaseT" to exclude the "after-arising BASE-T standards"). Other courts have disagreed, finding that terms reciting technical standards could be generic between different versions. *See, e.g.*, *Soverain Software v. Amazon.com, Inc.*, No. 6:04-CV-14, 2005 WL 6225276 at *5 (E.D. Tex. Apr. 7, 2005) (declining to limit HTTP to specific version of the HTTP Standard).

The closest Federal Circuit case is *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359 (Fed. Cir. 2005). There, the claims recited "normally" and "traditionally connectible" "standard" or "conventional" input/output ("I/O") ports. *Id*. at 1361. The district court limited the term to the I/O ports in existence at the time of the invention, and the Federal Circuit agreed. *Id*. at 1363. As explained by the court, terms like "conventional" and "traditionally" are "implicitly time-dependent," and "[a] claim cannot have different meanings at different times." *Id*. It was therefore appropriate to limit those terms to the "meaning specific to the time of filing." *Id.* at 1363-64. As Cellspin correctly points out, however, this was not because they recited a standard, but because the claims terms were inherently time-related. *See id*. (distinguishing other terms, such as "dedicated," that are "implicitly *not* time-related"). *PC Connector* thus provides no support for limiting a technical standard to the versions available at the time of invention.

On balance, the Court finds that the better view is to not limit technical standards to any version. Defendants seek, in effect, a "standards" exception where technologies described by a technical specification are limited to particular versions. They acknowledge, however, that this would not be appropriate for other terms. For instance, Defendants do not argue that a "mobile device" recited in the claims should be limited to devices that existed in 2007 (e.g., the original iPhone). (Tr. at 21:20-22:10.) That rule makes sense because limiting technologies to a specific time would defeat infringement through differences that have no bearing on a person of ordinary

United States District Court
Northern District of California

1   skill in the art's understanding of a term—e.g., a car is no less of a car because it uses ignition in

2   place of the original crank.[8]

3       Here, the parties have consistently used the term "Bluetooth" without referring to a version

4   and have not thereby generated confusion.  (*See, e.g.*, Dkt. No. 207-11 ("Madisetti Decl.") ¶ 82

5   (referring to Bluetooth patents without specifying a version); Dkt. No. 199-7 ("Foley Decl.") ¶ 43

6   (same); *see also* '794 Patent at 1:66, 2:4-14, 2:56 (same).)  This demonstrates that Bluetooth has a

7   well-understood meaning at present independent of any version.  Defendants have not shown that

8   the case was any different in the past.  Accordingly, the term Bluetooth is properly considered as

9   "implicitly *not* time-related" and thus not limited to the versions available in 2007.  *PC Connector*,

10  406 F.3d at 1363 (emphasis in original).

11      The Court therefore declines to limit the term "Bluetooth" to the versions available in

12  2007.  Because the parties do not otherwise dispute (or consider) the meaning of this term, the

13  Court adopts no further construction beyond rejecting Defendants' limitation.

14      **E.    "paired connection" (All Asserted Claims)**

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| "A Bluetooth device with which a link key has been exchanged (either before connection establishment was requested or during connecting phase)." | **Paired**: "in the state of having an exchanged link key (either before connection establishment was requested or during connecting phase)" | **Paired**:  in the condition of having an exchanged link key (either before connection establishment was requested or during connecting phase) |

20      As explained above, all asserted claims require a "paired" connection.  Both parties

21  propose to construe "paired" based on the definition of a "paired device" found in the 2007

22  Bluetooth specification, which is "a Bluetooth device with which a link key has been exchanged

23  (either before connection establishment was requested or during connecting phase)."  (Case No.

---

[8] At the hearing for this motion, Defendants argued that the distinction arises because Bluetooth is a trademark that refers to a source rather than technology.  (Tr. at 22:15-22.)  Many technologies, however, have begun their existence as referring to sources only to acquire generic meaning (e.g., "Xerox").  Moreover, even assuming that Bluetooth refers to source, Defendants have not shown that the source is a specification version rather than, for example, a standard-setting body, like the Bluetooth Special Interest Group.

4:17-cv-05928, Dkt. No. 153-8 ("Bluetooth Specification") at 15.)  The only genuine dispute lies with the word "state," which Cellspin contends has a specialized meaning in Bluetooth.  (*See* Tr. at 37:15-21.)  At the hearing for this motion, however, the parties agreed to replace "state" with "condition," which resolves the dispute.  (*Id*. at 38:6-24.)

Accordingly, the Court construes "paired" as "in the condition of having an exchanged link key (either before connection establishment was requested or during connecting phase)."

### F.    "cryptographically authenticated" (Claims 1-3 of the '847 Patent)

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| "verified as a legitimate transmission, user, or system including by use of encryption and decryption involving an algorithm" | "authenticated using a cryptographic algorithm" | verified as legitimate by use of encryption and decryption involving an algorithm |

The asserted claims of the '847 Patent require a data capture device to "cryptographically authenticate [the] identity of the Bluetooth enabled cellular phone" while establishing a paired connection.  ('847 Patent at claim 1.)  Cellspin claims that authentication may be performed for other types of features, such as a transmission or user, based on a wholly different term in the '752 Patent.  (*See* Dkt. No. 153 at 19 (discussing encrypting data in the '752 Patent).)  The argument is meritless:  the '847 Patent specifically requires authenticating the identity of a cellular phone. Defendants, on the other hand, dispute the need to construe "authenticated," but do not identify any disagreement with Cellspin's interpretation.  This dispute is therefore largely not genuine.

At the hearing for this motion, the Court proposed construing this term as "verified as legitimate by use of  encryption and decryption involving an algorithm," and the parties agreed. (Tr. at 68:2-17.)  The Court therefore adopts that construction herein.

### G.    "along with" (All Asserted Claims)

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| "in addition to" | Plain and Ordinary Meaning | Plain and Ordinary meaning<br><br>(Not limited to "at the same time") |

Each asserted claim requires transferring new data "along with" a user identifier to a website. (*See, e.g.*, '794 Patent at claim 1.) The parties dispute whether "along with" includes a temporal limitation. Defendants, in the guise of plain and ordinary meaning, argue that it does. The Court disagrees: as both sides acknowledge, "along with" implies a sense of togetherness, which could be satisfied by either temporal togetherness (e.g., doing a thing at the same time) or some other type of togetherness (e.g., sending in the same data stream). (*See* Dkt. No. 207 at 14; Foley Decl. ¶ 48.)

Because this term is otherwise clear and easy to understand, the Court rejects Defendants' exclusively temporal interpretation but does not construe it further.

### H.   "polling" (Claim 16 of the '794 Patent)

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| "the process of repetitively checking status" | "periodically sending a request to check status" | checking status [of] on a predetermined basis |

Claim 16 of the '794 Patent requires "polling the Bluetooth enabled data capture device using the software module on the Bluetooth enabled mobile device," while the data capture device "listens for the polling request sent from the Bluetooth enabled mobile device." ('794 Patent at claim 16.) The parties agree on the basic idea of polling. Rather than having the data capture device send data immediately as it is received, the mobile device "periodically polls the digital data capture device 201 to determine the creation of a new file" for transfer. (*Id*. at 4:27-38; *see id.* at 4:55-64 (contrasting "push" mode).) This confers technical benefits because it allows the data capture device to maintain low power except for brief intervals of communication initiated by the mobile device. (*See* Dkt. No. 198-3 ("Foley Report") ¶ 259.) The parties disagree, however, on whether the status checks must be sent "periodically."

The precise nature of this dispute lacks clarity. Cellspin's expert, Dr. Foley, agrees that status checks must be sent "regularly," such as at one-minute intervals, to determine the creation of new data. (Foley Report ¶ 50.) At the hearing for this motion, however, he testified that the polling interval may change dynamically in response to conditions, such as device status or rate of data creation. (*See* Tr. at 46:3-12, 49:13-19.) He also testified that a device may be set to poll

United States District Court
Northern District of California

randomly.  (*Id*. at 51:24-52:1.)  Defendants do not dispute that the polling interval may change

dynamically, but argue that polling cannot be done "erratically."  (*Id*. at 50:12-15.)  Cellspin,

however, does not argue that it can, but merely claims that the mobile device can be programmed

(i.e., predetermined) to poll on a random basis.  Although Dr. Foley quibbles with this phrasing,

the Court finds that programming a device to poll randomly is predetermined and not "erratic."

Accordingly, the Court construes "polling" as "checking status [of] on a predetermined

basis," where "predetermined" refers to programming that sets the frequency of the status checks

(e.g., at set intervals, dynamic intervals, randomly, etc.).[9]

I. **"data signal" and "event notification[s]" "corresponding to existence of new data" (Claim 1 of the '794 Patent, Claims 1 and 12 of the '752 Patent,  Claim 1 of the '847 Patent)**

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| Plain and Ordinary Meaning<br><br>Alternatively, "indication that an event has happened" | a notice/signal that is sent by the data capture device when it acquires new data and that informs the [mobile device / cellular phone] of the presence of newly acquired data in the data capture device" | an indication of the presence of newly acquired data |

Claim 1 of the '794 Patent recites "sending a data signal to the Bluetooth enabled mobile

device, corresponding to existence of new data, by the software module on the Bluetooth enabled

data capture device," where the mobile device "listens for the data signal."  ('794 Patent at Claim

1.)  Claims 1 and 12 of the '752 and claim 1 of the '847 Patent include similar limitations but use

the term "event notification" instead of "data signal."  ('752 Patent at Claims 1, 12; '847 Patent at

Claim 1.)  Defendants argue that that the data signal or notification must indicate the presence of

new data, as opposed to a generic event, and that it must be sent when the data capture device first

acquires the data in a cause-and-effect manner.

---

[9] The parties' original constructions are not helpful.  Although Defendants focus on the word "periodically" used in the intrinsic evidence, that word can refer to either "occurring or recurring at regular intervals" or to "occurring repeatedly from time to time."  *See Periodic*, M-W.COM, https://www.merriam-webster.com/dictionary/periodic.  The second definition is identical to Cellspin's construction, and the first is used by Dr. Foley, so the use of the term "periodically" in the specification and prosecution history does not resolve the dispute.

United States District Court<br>Northern District of California

The first issue is not genuinely disputed. Cellspin contends that the claims already recite "corresponding to new data," but does not substantively dispute the requirements and agrees to the construction of "an indication of the presence of newly acquired data." (Tr. at 58:10-12, 59:6-9.) The second issue differs across the patents. Although the '794 Patent may send the data signal as soon as data is received, the '752 Patent expressly requires "enabling event notifications" using a message from the mobile device before an event notification may be sent. (*See* '752 Patent at Claim 1.) Thus, an event notification may be sent long after data has been acquired if notifications were not enabled at the time. Because the parties agreed to construe both terms the same way, Defendants' second requirement lacks support in the intrinsic evidence.

Accordingly, the Court construes "data signal . . . corresponding to existence of new data" and "event notification[s] . . . corresponding to existence of new data" as "an indication of the presence of newly acquired data."

### J.    "Applying" / "Attaching" / Attach"  (Claims 1 and 16 of the '794 Patent, Claims 1 and 12 of the '752 Patent)

| Cellspin's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|
| Plain and Ordinary Meaning | "embedding / embed into the [obtained] new data"[10] | Plain and Ordinary meaning |

The independent claims of the '794 Patents recite "applying . . . a user identifier to the new data for each destination web service." ('794 Patent at Claims 1, 16.) Claim 12 of the '752 Patent similarly require "attaching a user identifier" along with an "action setting" and "destination web address" to "the obtained new data." ('752 Patent at Claim 12.) Claim 1 recites a mobile device "configured to attach a user identifier, an action setting, and a destination web address . . . to the obtained new data." (*Id*. at Claim 1.) Cellspin contends that these terms should have their plain and ordinary meaning, while Defendants contend that they should be construed as "embedding."

As an initial matter, the Court agrees with Cellspin that the plain and ordinary meaning of

---

[10] Defendants originally proposed to construe this term as "embedding / embed into each data segment of the [obtained] new data." (*See* Claim Construction Statement at 16.) "Data segments" was originally used in claim 39 of the '794 Patent, which is not asserted.

"attaching" and "applying" is not limited to "embedding." Defendants claim otherwise based on the prosecution history of the '794 Patent. There, Cellspin had distinguished prior art by arguing, *inter alia*, that the "applicant teaches a method where multiple sender devices send data to a single receiver with unique user information embedded inside every segmented data transfer." ('794 Patent Prosecution History at 33.) By contrast, prior art that sends data without a user identifier "will make the invention unfeasible." (*Id*. at 34.) These statements, however, related to claim 39 of the application, which specifically recited "segmenting data into data segments" and "applying a user identifier to each data segment." (*Id*. at 29-30.) By contrast, in relation to claims 1 and 16, Cellspin consistently distinguished the invention as "using a user identifier for the data." (*See id*. at 20-21.) The lack of any mention of "embedding" in relation to claims 1 and 16 confirms that the terms "attaching" and "applying" are not limited to "embedding," particularly when data segments are not used.[11]

Accordingly, there is no basis to limit the plain and ordinary meaning of "attaching" and "applying" to "embedding." (*See* Foley Decl. ¶ 55.) Because the meaning of these terms is otherwise clear and easy to understand, the Court does not construe them further.[12]

### III.   CONCLUSION

Based on the foregoing, the Court provides the following constructions of the claim terms.

| Term | Construction |
|------|-------------|
| Temporal Order | The elements of each asserted claim must be performed in the order they appear in the claims, with the following exceptions:<br><br>1. "Providing a software module" in the '794 Patent can occur in any order before the "detecting and signaling" step. |

---

[11] Defendants that "attaching" is used for both claims. However, while "attaching" is the same across claims, "data segments" is not. The prosecution history excerpts cited in Defendants' brief confirm that "data / data segment" are different concepts, even if they are interchangeable in the cited context. (*See* Dkt. No. 207 at 23.)

[12] In particular, the phrase "user identifier" does not appear to be genuinely disputed; Defendants do not even address it in their brief.

United States District Court
Northern District of California

| | |
|---|---|
| | 2. Sending a "data signal" in claim 1 of the '794 Patent can occur simultaneously with transferring new data.<br><br>3. Claim 1 of the '847 Patent requires an order for only the elements following the terms "configured to" and "controls to." |
| "after the paired connection is established" | after the paired connection is established and maintained on a continuous basis |
| "Bluetooth" | No construction.  No limitation as to version. |
| "paired" | in the condition of having an exchanged link key (either before connection establishment was requested or during connecting phase) |
| "cryptographically authenticated" | verified as legitimate by use of encryption and decryption involving an algorithm |
| "along with" | Plain and ordinary meaning.  Not limited to "at the same time." |
| "polling" | checking status [of] on a predetermined basis |
| "data signal" / "event notification[s]" "corresponding to existence of new data" | an indication of the presence of newly acquired data |
| "applying" / "attaching" / "attach" | Plain and ordinary meaning |

Cellspin's motion to strike Defendants' rebuttal expert declaration (Dkt. No. 199) is **DENIED** as moot because the Court does not rely on it.  The joint motion to schedule a technology tutorial (Dkt. No. 218) is **DENIED** as moot because the tutorial already took place.

This Order terminates docket numbers 151 in case number 17-5928; 133 in case number 17-5929; 131 in case number 17-5931; 113 in case number 17-5932; 199 and 218 in case number 17-5933; 134 in case number 17-5934; and 130 in case number 17-5936.

**IT IS SO ORDERED.**

Dated: April 14, 2021

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**