1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CELLSPIN SOFT, INC.**, | **SUMMARY JUDGMENT ORDER** |
| Plaintiff, | |
| v. | Case No. 17-cv-05928-YGR |
| **FITBIT, INC.**, | Dkt. No. 148 |
| Defendant. | |
| v. | Case No. 17-cv-05929-YGR |
| **MOOV, INC.**, | Dkt. No. 130 |
| Defendant. | |
| v. | Case No. 17-cv-05931-YGR |
| **NIKE, INC.**, | Dkt. No. 128 |
| Defendant. | |
| v. | Case No. 17-cv-05932-YGR |
| **UNDER ARMOUR, INC.**, | Dkt. No. 110 |
| Defendant. | |
| v. | Case No. 17-cv-05933-YGR |
| **FOSSIL GROUP, INC., ET AL.**, | Dkt. No. 193 |
| Defendants. | |
| v. | Case No. 17-cv-05934-YGR |
| **GARMIN INTERNATIONAL, INC., ET AL.**, | Dkt. No. 130 |
| Defendants. | |
| v. | Case No. 17-cv-05936-YGR |
| **NIKON AMERICAS, INC., ET AL.**, | Dkt. No. 135 |
| Defendants. | |

1    Plaintiff Cellspin Soft, Inc. ("Cellspin") brings these seven patent infringement actions[1]

2    against defendants Fitbit, Inc., Moov, Inc., Nike, Inc., Under Armour, Inc., Fossil Group, Inc.,

3    Misfit Inc., Garmin International, Inc., Garmin USA Inc., Nikon Inc., and Nikon Americas, Inc.

4    (collectively, "Defendants") for infringement of U.S. Patent Nos. 8,738,794 (the "'794 Patent"),

5    8,892,752 (the "'792 Patent"), and 9,749,847 (the "'847 Patent").

6    Now before the Court is Defendants' motion for summary judgment.  (Dkt. No. 193

7    ("MSJ").)  Defendants argue that the asserted patents are invalid as claiming patent ineligible

8    subject matter under 35 U.S.C. § 101.  Having considered the papers, the parties' arguments made

9    at the hearing held on February 16, 2021, and the admissible evidence, the Court **GRANTS IN PART**

10   and **DENIES IN PART** Defendants' motion for summary judgment.

11   I.    **BACKGROUND**

12         A.    **Patents At Issue**

13   The asserted patents, each titled "Automatic Multimedia Upload for Publishing Data and

14   Multimedia Content," share the same specification.  The patents are directed to the distribution of

15   multimedia content.  (*See* '794 Patent at 1:32-33.)  As explained by the specification, prior art[2]

16   methods of capturing and publishing multimedia content to the Internet were cumbersome.  (*Id.* at

17   1:37-54.)  A user would capture content using a separate "data capture device," such as a digital

18   camera.  (*Id.* at 1:38-42.)  The user would then manually transfer the content to another device,

19   such as a personal computer, using a universal serial bus (USB) or memory stick.  (*Id.* at 1:43-45.)

20   Last, the user would "manually upload" the content unto a website, which "takes time and may be

21   inconvenient for the user."  (*Id.* at 1:45-47.)

22

23   _____

24   [1] Seven other patent infringement actions were initially filed and subsequently dismissed
     or stayed pending *inter partes* review.  *See* Case Nos. 17-cv-5930, 17-cv-5937, 17-cv-4938, 17-

25   cv-5939, 17-cv-5941, 17-cv-6881, 20-cv-3673.  As ordered by the Court, the parties filed the
     motion for summary judgment in case number 17-cv-5933 only, with notice of joinder in each

26   other case at docket numbers listed in the caption of this Order.  Unless otherwise noted, all docket
     citations refer to case number 17-cv-5933 (*Cellspin Soft, Inc. v. Fossil Group Inc.*).

27   [2] Cellspin claims a priority date of December 28, 2007, which Defendants do not dispute

28   for purposes of this motion.  Accordingly, Defendants' motion is evaluated against the background
     state of the art that existed in December 2007.

United States District Court
Northern District of California

United States District Court
Northern District of California

To reduce inconvenience and enable real-time publishing, the Asserted Patents automate the process. (*See id*. at 1:33-36, 1:48-54, 1:64-2:3.) While maintaining the two-device structure, the patents require each device to be "Bluetooth enabled" to communicate wirelessly. (*Id*. at 2:4-14.) The devices are "paired," which involves "establishing a connection between two . . . devices that mutually agree to communicate with each other." (*Id*. at 3:56-61.) The intermediary device is a mobile device, not a personal computer, and it has an application that detects and transfers data from the data capture device. (*Id*. at 2:15-25.) The mobile device then automatically publishes the captured data to websites based on pre-selected configurations, such as time of day. (*Id*. at 2:35-54.) As the result, in an illustrative example, a reporter working on a story can automatically publish photos on her private blog as she moves around the city. (*Id*. at 9:12-36.)

For purposes of this motion, the parties agree that the following claims are representative: claims 1 and 16 of the '794 Patent; claim 1 of the '752 Patent; and claim 1 of the '847 Patent. (Dkt. No. 206 ("Joint Supplemental Submission") at 2.) Claim 1 of the '794 Patent recites:

> *A method for acquiring and transferring data* from a Bluetooth enabled data capture device to one or more web services via a Bluetooth enabled mobile device, the method comprising:
>
> > *providing a software module* on the Bluetooth enabled data capture device;
> >
> > *providing a software module* on the Bluetooth enabled mobile device;
> >
> > *establishing a paired connection* between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device;
> >
> > *acquiring new data* in the Bluetooth enabled data capture device, wherein new data is data acquired after the paired connection is established;
> >
> > *detecting and signaling the new data* for transfer to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer comprises:
> >
> > > *determining the existence of new data* for transfer, by the software module on the Bluetooth enabled data capture device; and

3

*sending a data signal to the Bluetooth enabled mobile device*, corresponding to existence of new data, by the software module on the Bluetooth enabled data capture device automatically, over the established paired Bluetooth connection, wherein the software module on the Bluetooth enabled mobile device listens for the data signal sent from the Bluetooth enabled data capture device, wherein if permitted by the software module on the Bluetooth enabled data capture device, the data signal sent to the Bluetooth enabled mobile device comprises a data signal and one or more portions of the new data;

*transferring the new data* from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device automatically over the paired Bluetooth connection by the software module on the Bluetooth enabled data capture device;

*receiving,* at the Bluetooth enabled mobile device, *the new data* from the Bluetooth enabled data capture device;

*applying,* using the software module on the Bluetooth enabled mobile device, *a user identifier* to the new data for each destination web service, wherein each user identifier uniquely identifies a particular user of the web service;

*transferring the new data* received by the Bluetooth enabled mobile device along with a user identifier to the one or more web services, using the software module on the Bluetooth enabled mobile device;

*receiving,* at the one or more web services, *the new data* and user identifier from the Bluetooth enabled mobile device, wherein the one or more web services receive the transferred new data corresponding to a user identifier; and

*making available*, at the one or more web services, *the new data* received from the Bluetooth enabled mobile device for public or private consumption over the internet, wherein one or more portions of the new data correspond to a particular user identifier.

Claim 16 of the '794 Patent is identical, but requires "polling" instead of "signaling" to detect newly captured data.  ('794 Patent at 14:27-39.)  As the specification explains, in the "pull" mode, the application on the mobile device "periodically polls" the data capture device to detect new files for transfer.  (*Id*. at 4:28-38.)  By contrast, in the "push" mode, the data capture device itself detects new data and sends a signal to the mobile device to initiate transfer.  (*Id*. at 4:55-66.)

Thus, claim 1 covers the "push" mode, while claim 16 covers the "pull" mode.  The detection step of claim 16 accordingly recites:

> *detecting the new data* for transfer to the Bluetooth enabled mobile device, wherein detecting the new data for transfer comprises:
>
>> *polling the Bluetooth enabled data capture device* using the software module on the Bluetooth enabled mobile device over the established paired Bluetooth connection, wherein the Bluetooth enabled data capture device listens for the polling request sent from the Bluetooth enabled mobile device; and
>>
>> *determining the existence of new data for transfer*, by the software module on the Bluetooth enabled data capture device;

Claim 1 of the '752 Patent has similar limitations, but adds encryption and transfer protocols.  Although the specification does not describe these features in detail, it notes that "[t]he transport protocol . . . between the [mobile device] and the [publishing website] may be hypertext transfer protocol (HTTP) or extensible markup language-remote procedure calls (XML-RPC)." ('752 Patent at 10:4-7.)  For encryption, it states only that the system "will use various security, encryption and compression techniques to enhance the overall user experience."  (*Id*. at 10:54-56.) The claim also describes event notifications, which is a variation on the "push" mode where the mobile device first enables event notifications on the data capture device before the latter signals the presence of new data.  (*See generally id.* at claim 1.)  Claim 1 recites:

> *A method for transferring data* from a Bluetooth enabled data capture device to a remote internet server via a Bluetooth enabled mobile device comprising:
>
>> *performing* at the Bluetooth enabled data capture device:
>>
>>> *establishing a secure paired Bluetooth connection* between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device, wherein the secure paired Bluetooth connection uses a cryptographic encryption key;
>>>
>>> *acquiring new data* in the Bluetooth enabled data capture device, wherein new data is data acquired after the secure paired Bluetooth connection is established;

*detecting and signaling the new data for transfer*, to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer comprises:

> *receiving a message* from the Bluetooth enabled mobile device, over the established secure paired Bluetooth connection, *to enable event notifications*, corresponding to new data for transfer, on the Bluetooth enabled data capture device;

> *enabling event notification* on Bluetooth enabled data capture device, corresponding to new data for transfer;

> *determining existence of the new data* for transfer; and

> *sending an event notification to* the Bluetooth enabled mobile device, corresponding to existence of new data for transfer, over the established secure paired Bluetooth connection, wherein the Bluetooth enabled mobile device is configured to listen for the event notification sent from the Bluetooth enabled data capture device;

*encrypting*, using the cryptographic encryption key, *the new data* acquired in the Bluetooth enabled data capture device; and

*transferring the encrypted data* from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device, over the established secure paired Bluetooth connection, wherein the Bluetooth enabled mobile device has access to the internet, wherein the Bluetooth enabled mobile device is configured to receive the encrypted data and obtain the new data from the encrypted data using the cryptographic encryption key, wherein the Bluetooth enabled mobile device is configured to *attach a user identifier, an action setting and a destination web address of a remote internet server to the obtained new data*, wherein the user identifier uniquely identifies a particular user of internet service provided by the remote internet server, wherein *action setting comprises one of a remote procedure call (RPC) method and hypertext transfer protocol (HTTP) method*, and wherein the Bluetooth enabled mobile device is configured to send the obtained new data with the attached user identifier, an action setting and a destination web address to a remote internet server.

Last, claim 1 of the '847 Patent recites a system to perform the above methods. It recites:

A *system* comprising:

> a Bluetooth enabled *data capture device*, comprising:

> > a first *memory* device;

> > a first *processor* coupled to the first memory device;

a first Bluetooth *communication device* configured to establish a paired Bluetooth wireless connection between the Bluetooth enabled data capture device and a Bluetooth enabled cellular phone, wherein the Bluetooth enabled data capture device is configured to cryptographically authenticate identity of the Bluetooth enabled cellular phone when the first Bluetooth communication device establishes the paired Bluetooth wireless connection;

a *data capture circuitry*;

said first processor *configured to acquire new-data* using the data capture circuitry after the paired Bluetooth wireless connection between the Bluetooth enabled data capture device and the Bluetooth enabled cellular phone is established;

said first processor *configured to store the acquired new-data* in the first memory device; and said first processor configured to send an event notification and the acquired new-data to the cryptographically authenticated Bluetooth enabled cellular phone over the established paired Bluetooth wireless connection, wherein the event notification corresponds to the acquired new-data and comprises sending a signal to the cryptographically authenticated Bluetooth enabled cellular phone;

a *mobile application* in the Bluetooth enabled cellular phone comprising executable instructions that, when executed by a second processor inside the Bluetooth enabled cellular phone controls the second processor to:

detect and receive the acquired new-data, comprising:

*listen for the event notification*, sent from the Bluetooth enabled data capture device, over the established paired Bluetooth wireless connection, wherein the event notification corresponds to the acquired new-data; and

*receive the event notification and the acquired new-data*, from the Bluetooth enabled data capture device, over the established paired Bluetooth wireless connection, wherein receiving the event notification comprises receiving the signal sent by the Bluetooth enabled data capture device corresponding to the acquired new-data;

*store the new-data* received over the established paired Bluetooth wireless connection, in a second memory device of the Bluetooth enabled cellular phone before transfer to a website; and

*use HTTP to transfer the new-data* received over the established paired Bluetooth wireless connection, along with user information stored in the second memory device of the cryptographically authenticated Bluetooth enabled cellular phone, to the website, over the cellular data network;

wherein the mobile application further comprises executable instructions to control the processor to *provide a graphical user interface (GUI) for the new-data*.

United States District Court
Northern District of California

### B.      Procedural History

The Court has previously found the above-recited claims invalid under 35 U.S.C. § 101 for claiming patent ineligible subject matter.  (Dkt. No. 85 ("MTD Order").)  Specifically, the Court found that the claims are directed to a patent ineligible abstract idea of "acquiring, transferring, and publishing data and multimedia content on one or more websites."  (*Id*. at 11:19-20.)  The Court also found that the claims lack an inventive concept because they "merely provide a generic [computer] environment in which to carry out the abstract idea."  (*Id*. at 15:9-22.)  In so finding, the Court discounted Cellspin's allegations of inventiveness because those were found nowhere in the specification.  (*See id*. at 16:12-18:7.)

Cellspin appealed.  (Dkt. No. 88.)  The Federal Circuit affirmed the Court's finding that the claims were directed to an abstract idea of "capturing and transmitting data from one device to another."  *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019).  In particular, the court confirmed that the claims merely automate an existing manual process of transferring and publishing data.  *Id*. at 1316.  However, the Federal Circuit reversed the Court's finding of lack of an inventive concept because at the motion to dismiss stage, a plaintiff's allegations must be assumed to be true.  *Id*. at 1316-18.

Cellspin had alleged that the claims recited unconventional elements, including (1) separating the steps of capturing and publishing data between two devices linked via a wireless, paired connection (referred to as "two-step, two-device structure"), (2) establishing a paired connection before forwarding the data, and (3) using HTTP by an intermediary device while the data is "in transit."  *Id*.  Because "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)," the Federal Circuit vacated the dismissal and remanded.  *Id*. at 1318 (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121,1126 (Fed. Cir. 2018)), 1320; (*see* Dkt. No. 110.)

On remand, this Court entered a schedule setting early summary judgment briefing for Section 101 eligibility.  (Dkt. No. 164.)  Cellspin filed its eligibility contentions, identifying each alleged inventive concept, on June 19, 2020.  (Dkt. No. 165.)  Defendants filed the instant motion on October 6, 2020.  (Dkt. No. 193.)  Cellspin filed its opposition on October 30, 2020 (Dkt. No.

198 ("Opp.")), and Defendants their reply on November 13, 2020.  (Dkt. No. 200 ("Reply").)  The Court held a hearing on this motion on February 16, 2021.  (Dkt. No. 215.)

## II.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Factual disputes are only "genuine" if the evidence could cause a reasonable jury to reach a verdict for the other party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The movant can meet its burden by "showing . . . there is an absence of evidence to support the nonmoving party's case." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (citation and quotation omitted).  Once the movant meets its burden of showing the absence of genuine issues of material fact that burden shifts to the nonmoving party, who must demonstrate the existence of a material issue of fact.  *Mahdavi v. C.I.A.*, 898 F.2d 156 (9th Cir. 1990) (citations omitted).

A party opposing summary judgment must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Turner v. Brown*, 961 F.2d 217 (9th Cir. 1992) (citations omitted).  The opposition party "cannot rest on the allegations in his pleadings to overcome a motion for summary judgment."  *Id.*  Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Inudus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III.   ANALYSIS

The Federal Circuit affirmed this Court's holding that the claims are directed to a patent ineligible idea of collecting, transmitting, and publishing data.  Accordingly, that is the law of the case, and the only remaining question lies with the "inventive concept."  Cellspin proposes fifty inventive concepts, but the parties focus on five main "categories" in their briefs.  The Court first reviews the legal requirements for the inventive concept and then addresses each category, before turning to the remainder of the concepts.

//

United States District Court
Northern District of California

United States District Court
Northern District of California

**A.      Section 101 "Inventive Concept" Requirement**

The Patent Act permits obtaining a patent on "any new and useful process, machine, manufacture, or composition of matter."  35. U.S.C. § 101.  For over a century, courts have interpreted this and previous provisions to exclude patenting laws of nature, natural phenomena, and abstract ideas.  *See Diamond v. Chakrabarty*, 447 U.S. 303, 308-09 (1980).  Where patent claims are "directed" to such subject matter—meaning, where the claimed advance over prior art focuses on such subject matter[3]—the patents are not necessarily invalid.  *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).  However, courts must then ask, "What else is there in the claims?"  *Id*.  This second-stage analysis has been described as a "search for an 'inventive concept'" intended to ensure that the patent amounts to "significantly more" than the patent ineligible subject matter.  *Id*. at 217-18.

The Federal Circuit has not clearly defined an "inventive concept."  The inquiry generally rests on whether "the elements of each claim both individually and 'as an ordered combination' . . . 'transform the nature of the claim' into a patent eligible application.'"  *Id.*  The concept must therefore be, at minimum, inventive, concrete (an "application"), and patent eligible.  It must also exist in the claim elements, individually or in combination, beyond the patent ineligible subject matter.  *See Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020) (unclaimed inventive concepts are irrelevant).  Within this framework, courts have more explicitly articulated what *fails* to provide an inventive concept, rather than what succeeds.  Accordingly, the following provide examples of what is *not* an inventive concept:

First, and foremost, an inventive concept cannot rest on "performance of 'well-understood, routine, and conventional activities' previously known in the industry."  *In re TLI Commn's LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 225).  The prohibition against "conventional" activities supplying an inventive concept is one of the best-established

---

[3] *C R Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1382 (Fed. Cir. 2020); *see also Elecs. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (looking at claims' "character as a whole"); *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 at 1348 (Fed. Cir. 2016) (considering the "basic thrust" of the claims).

rules in Section 101 analysis. *See, e.g.*, *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 79 (2012) ("Simply appending conventional steps, specified at a high level of generality . . . cannot make [the subject matter] patentable."); *Diamond v. Diehr*, 450 U.S. 175, 180 (1981) (rejecting additional steps that were "conventional and necessary to the [abstract] process"); *Alice*, 573 U.S. at 223-24 (explaining that conventional activity is "not enough" because it provides no "practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself" (brackets and citation omitted)).

In the computer context, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 221; *see, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Indeed, "invocations of computers that are not even arguably inventive are insufficient to pass the test of an inventive concept." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1170 (Fed. Cir. 2018); (noting that the rule has been affirmed "many times"); *Electric Power*, 830 F.3d at 1355 (citing cases). However, even when each computer element is generic, a novel arrangement of those elements may supply an inventive concept. *See, e.g.*, *Bascom*, 827 F.3d at 1349-50 (finding that installing a filter at a specific location was inventive even if the concept of filtering itself was conventional).

Second, the inventive concept cannot be overgeneralized. "Stating an abstract idea while adding the words 'apply it' is not enough for patent eligibility." *Alice*, 573 U.S. at 217. Similarly, where the patent purports to claim an improvement but is "wholly devoid of details which describe *how* this [result] is accomplished," the claims are not transformed. *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1346 (Fed. Cir. 2018) (emphasis in original); *see also Am. Axle*, 967 F.3d at 1296 ("[T]o avoid ineligibility, a claim must have the specificity required to transform the claim from one claiming only a result to one claiming a way of achieving it." (brackets, citation, and quotation marks omitted)). For this reason, lack of specificity alone may prevent an inventive concept from transforming the claim. *See SAP*, 898 F.3d at 1167 (Fed. Cir. 2018); *Am. Axle*, 967 F.3d at 1299. Moreover, "result-focused, functional character of claim language" can separately confirm patent ineligibility. *Electric Power*, 830 F.3d at 1356.

Third, an inventive concept cannot rest on limiting an abstract idea to a technological field or application. *See Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010). For example, the Pythagorean theorem would not be patentable simply because a patent stated it could "be usefully applied to existing surveying techniques." *Parker v. Flook*, 437 U.S. 584, 590 (1978). Similarly, limiting claims to a particular field of information, such as investment information, cannot make them non-abstract. *SAP*, 898 F.3d at 1169. Nor can limiting an abstract idea, such as using advertising as currency, to the Internet. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014). The Supreme Court has previously described this as "post-solution activity" that has no effect on patent eligibility. *See Flook*, 437 U.S. at 590 & n.11 (noting that "it is not . . . clear why a process claim is any more or less patentable because [of] the specified end use contemplated").

Fourth, the inventive concept cannot itself be patent ineligible. For instance, an abstract idea for an algorithm cannot be transformed into patent eligibility using more algorithms. *See SAP.*, 898 F.3d at 1169. Relatedly, "a claimed invention's use of the ineligible concept to which it is directed cannot supply an inventive concept." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018); *see Chargepoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 774 (Fed. Cir. 2019) (finding that "network control" cannot supply an inventive concept because it is itself abstract); *cf. Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("A claim for a *new* abstract idea is still an abstract idea." (emphasis in original)).

Fifth, an inventive concept is not novelty. Novelty requires analyzing the claim as a whole. *BSG*, 899 F.3d at 1291. The inventive concept analysis focuses on the patent eligible elements.[4] *See Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019).

Thus, an inventive concept analysis presents two distinct inquiries: first, whether each claim element *apart from the patent ineligible subject matter* was "well-understood, routine, or conventional," and second, whether those elements "as an ordered combination . . . add nothing

---

[4] That does not mean that the patent ineligible or conventional elements are ignored. *See Diehr*, 450 U.S. at 188. But it does mean that those elements cannot supply the required novelty. *See Simio, LLC v. FlexSim Software Prods., Inc.*, 893 F.3d 1353, 1364 (Fed. Cir. 2020).

. . . that is not already present" when the elements are considered separately. *Id.* at 1348-49. For this reason, the novelty of the invention as a whole—e.g., a "groundbreaking" abstract idea or law of nature—cannot make the claims patent eligible. *cxLoyalty, Inc. v. Martiz Holdings Inc.*, 986 F.3d 1367, 1378 (Fed. Cir. 2021). At the same time, "[t]he mere fact that something is disclosed in a piece of prior art . . . does not mean it was well-understood, routine, and conventional." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018).

Whether a combination of claim elements supplies an "inventive concept" is a question of law. *BSG*, 899 F.3d at 1290. In *Berkheimer*, the Federal Circuit held that the issue of whether a claim element or combination is "well-understood, routine and conventional to a skilled artisan in the relevant field" is a question of fact that must be "proven by clear and convincing evidence." 881 F.3d at 1368. However, as *BSG* clarified, such factual disputes prevent summary judgment where "*the only issue* at step two is whether claim limitations are well-understood, routine, and conventional." 899 F.3d at 1290 (emphasis supplied). By contrast, where other issues—such as those listed above—preclude an inventive concept, summary judgment may be granted as a matter of law. *See, e.g.*, *Am. Axle*, 967 F.3d at 1298-99 (finding post-*Berkheimer* no genuine dispute over patent ineligibility irrespective of non-conventionality); *BSG*, 899 F.3d at 1291 (same).[5]

**B.      Category One:  Two-Step, Two-Device Structure**

The parties begin where the Federal Circuit left off:  the "two-step, two-device structure." Cellspin claims that as of December 28, 2007, "it was unconventional to separate the steps of capturing and publishing data so that each step would be performed by a different device linked via a wireless, paired connection."  (Opp. at 11:1-3; *see also* Dkt. No. 206-1 ("Inventive Concept Chart") # 2.)[6]  Defendants argue that such separation was conventional because the specification itself describes prior art having this feature.  Specifically, the specification states that prior to the

---

[5] In denying rehearing in *Berkheimer*, five judges clarified that the decision does not "cast[] doubt on the propriety" of earlier decisions finding patent eligibility without considering evidence and that it merely "narrow[ly]" holds that "to the extent it is at issue in the case," an element's conventionality is a question of fact.  890 F.3d 1369, 1373-74 (Fed. Cir. 2018) (Moore, Dyk, O'Malley, Taranto, & Stoll, JJ, concurring).

[6] *See also* Inventive Concept Chart # 1, 3-7, 39, 42, 43 (describing benefits of two-device structure), 23(a), 24, 25, 27-28, 38, 45, 50, 53, (describing benefits of automating that structure).

United States District Court
Northern District of California

purported invention of the asserted patents:

> Typically, the user would capture an image using a digital camera or a video camera, store the image on a memory device of the digital camera, and transfer the image to a computing device such as a personal computer (PC). In order to transfer the image to the PC, the user would transfer the image off-line to the PC, use a cable such as a universal serial bus (USB) or a memory stick and plug the cable into the PC. The user would then manually upload the image onto a website which takes time and may be inconvenient for the user.

(*E.g.*, '794 Patent at 1:38-47.)[7]

Defendants argue that this describes a "two-step, two-device" structure. The Court agrees. Like the asserted patents, the prior art had two devices—a digital camera and a personal computer. Like the asserted patents, the prior art separated the data capture and publication steps, with the digital camera performing the capture and the personal computer performing the publication. And like the asserted patents, the prior art inherently enabled certain benefits, such as allowing each device to be smaller and only serve one function. The only difference with the asserted patents lies in the use of a "wireless, paired" Bluetooth connection and a mobile intermediary device, instead of a cable connection and personal computer.[8] The record stands undisputed that those elements cannot supply an inventive concept.

As an initial matter, wireless communication is an abstract concept. *See Chamberlain*, 935 F.3d at 1347 ("[T]he broad concept of communicating information wirelessly, without more, is an abstract idea."). In *Chamberlain*, the claims recited wirelessly communicating information about a barrier (such as a garage door). *Id*. at 1345. The court found that the claims were directed to an abstract idea—wirelessly communicating status information about a system. *Id*. at 1346. It then held that under the stage-two analysis, "[w]ireless communication cannot be an inventive concept here, because it is the abstract idea that the claims are directed to." *Id*. at 1349. As described in

---

[7] Cellspin's experts admit that the above-described process was conventional. (*See* Dkt. No. 198-3 ("Foley Report") ¶¶ 60-62, 66; Dkt. No. 198-4 ("Singh Report") ¶¶ 58, 60, 62; Dkt. No. 198-5 ("Garlick Report") ¶¶ 60-67.) Moreover, the Federal Circuit routinely considers prior art described in the specification to be routine. *See, e.g.*, *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 754 (Fed. Cir. 2019).

[8] At the hearing for this motion, Cellspin admitted that the only inventive feature of its two-device system, despite its allegations, was the use of a "wireless, paired connection."

14

the next section, pairing is also an abstract idea.  Thus, these elements cannot supply an inventive concept as a matter of law—"a new abstract idea is still an abstract idea." *Synopsys,* 839 F.3d at 1151.  Moreover, even if the Court were to consider these elements, a "wireless, paired connection" is not even arguably inventive.[9] *SAP,* 898 F.3d at 1170.

Defendants proffer evidence that Bluetooth launched in 1999 and included pairing in its very first specification that year.  (*See* Dkt. No. 193-4 ("Madisetti Report") ¶¶ 75; Dkt. No. 193-5 ("1999 Bluetooth Specification") at 53.)  Cellspin's expert, Dr. Foley, who worked at the CEO of the Bluetooth Special Interest Group in 2007, admits that there were over one billion Bluetooth devices by December 2007.  (Foley Report ¶¶ 5, 116; Dkt. No. 193-7 ("Foley Depo.") at 99:20-101:1.)  Dr. Foley does not dispute that pairing, as described by the Bluetooth specification, was conventional:  he opines that "the conventional approach as of December 2007 was to pair devices as required."  (*See* Foley Report ¶ 140; *see also id.* ¶ 114 ("Since its onset in 1998, the Bluetooth specifications have contained a clear definition of what 'pairing' was and the steps required to pair two devices."), ¶ 42 (opining that the "conventional definition" of pairing comes from the 2007 specification).)  Notably, none of Cellspin's experts contend that the asserted patents invented pairing or wireless communication.  Thus, Defendants meet their initial burden to show that a wireless, paired connection was conventional.

Against this background, Cellspin's cited evidence, despite its volume, does not create a genuine dispute of fact.  As an initial matter, each of the three experts relied on by Cellspin admit that the two-step, two-device structure described in the specification was conventional.  (Foley Report ¶¶ 60-62, 66; Singh Report ¶¶ 58, 60, 62; Garlick Report ¶¶ 60-67.)  In the face of these admissions, "it [is] difficult, if not impossible, for a patentee to show a genuine dispute" over its conventionality.  *See Berkheimer*, 890 F.3d at 1371 (Moore, Dyk, O'Malley, Taranto, & Stoll, JJ, concurring).  And, indeed, none of the experts actually provide an opinion that supports Cellspin's claims for this inventive concept.  For example, the experts state that:

---

[9] Mobile devices are conventional at least because the specification calls them "ubiquitous" and "widespread."  (*See* '794 Patent at 9:46-49.)

- Smartphones were relatively new in 2007, and "apps" were rudimentary. (Foley Report ¶ 62; Singh Report ¶ 60.) Merely using a software on a mobile phone device, however, is not claimed to be inventive, and, in any case, the claims provide no implementation details for the "app" or software module sufficient to make this anything more than claiming a result. *Am. Axle*, 967 F.3d at 1296.

- Pairing was not "required" by Bluetooth. (Foley Report ¶¶ 94-95, 212-13; Singh Report ¶¶ 103-14.) Whether something is required, however, says nothing about its conventionality. By analogy, using a computer to create electronic records is not required, but it is certainly conventional. *See Alice*, 573 U.S. at 225. Dr. Foley confirms that Bluetooth specifications contained a "clear definition" of pairing since 1998, which shows that it was conventional. (Foley Report ¶¶ 111-18.)

- Commercial embodiments of the claims did not arise until 2012. (*Id.* ¶ 75; Singh Report ¶¶ 84-86.) Mere novelty, however, does not show that paired, wireless connections were non-conventional. *cxLoyalty*, 986 F.3d at 1378.

- Automating manual processes was inventive. (Garlick Report ¶¶ 66-67.) That, by itself, cannot supply an inventive concept. *See, e.g.*, *Chamberlain*, 935 F.3d at 1347 (automating garage door openers).

Cellspin cites these expert opinions to show that the claimed "Bluetooth implementation" was not conventional (Opp. at 6, 12),[10] but as shown above, none of the experts actually support that conclusion. Because the cited evidence does not create a dispute of fact, neither does the non-cited evidence. *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (requiring a nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment"; a district court need not "scour the record in search of a genuine issue of triable fact").

At its core, the record here shows that the "two-step, two-device structure" was well-known, and, indeed, formed the background art that the asserted patents sought to improve.[11] The only new element comes from using a "wireless, paired" connection between the devices, in place

---

[10] Cellspin also cites its patent eligibility contentions. (Dkt. No. 198-2 ("Contentions").) Contentions are a form of pleading—not evidence—and cannot create a dispute of fact. To the extent that Cellspin relies on the evidence cited in those contentions, the exhibit numbering does not correspond to that in the briefing, and Cellspin fails to identify them with particularly.

[11] Cellspin alleges, as it did at the pleading stage, that the "two-device" structure improved upon prior art that required the data capture device to have built-in internet. Although the Federal Circuit found this argument persuasive at the pleading stage, *Cellspin*, 927 F.3d at 1316, the Court fails to see how Cellspin has shown inventiveness at this stage by reference to improving one conventional structure using another conventional structure.

1    of a manual connection.  Because those elements are both abstract and wholly generic, they cannot

2    supply an inventive concept sufficient to transform the claims into patent eligibility.[12]  *See Credit*

3    *Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1056 (Fed. Cir. 2017) (automating a manual

4    process "is precisely the sort of invention that the *Alice* Court deemed ineligible for patenting");

5    *OIP Techs., Inc. v. Amazon, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (similar); *cf. McRO, Inc. v.*

6    *Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016) (finding patent eligibility

7    where the claims described a *specific* method for automation).

8        Accordingly, the Court grants summary judgment that the "two-step, two-device" structure

9    does not provide an inventive concept under 35 U.S.C. § 101.

10       **C.    Category Two:  Pairing Before Sending Data**

11       The next category of inventive concepts takes pairing a step further:  instead of generic

12   pairing, Cellspin claims that "establishing a paired connection *before* sending data" was inventive.

13   (Opp. at 12:26-28 (emphasis supplied); Inventive Concept Chart # 9, 29.)[13]  The common

14   specification defines pairing as "establishing a connection between [Bluetooth] devices that

15   mutually agree to communicate with each other."  ('794 Patent 3:57-59.)  That, of course, is an

16   abstract concept.  Humans have "established a connection" by agreeing to communicate for

17   thousands of years before the patents, including by building embassies, sending scouts to

18   neighboring tribes, and exchanging telephone numbers at a bar.  *See Intellectual Ventures I LLC v.*

19   *Symantec Corp.*, 838 F.3d 1307, 1313, 1318 (Fed. Cir. 2016) (activities performed by humans are

20   abstract); *cf. Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (fundamental economic practices that

21   have long prevailed in human systems are not patent eligible).

22       In claim construction, however, both parties have agreed to limit the term "pairing" to

23   Bluetooth pairing, as defined in the 2007 specification.  (*See* Dkt. No. 153 ("Claim Construction

24   Statement") at 16.)  The Bluetooth specification defines "paired device" as "A Bluetooth device in

---

26       [12] The Court further notes that the claims' recitation of a "wireless, paired" connection is entirely results-oriented.  The claims do not describe any *way* to create the connection, only the result that the devices are so connected.  *See Am. Axle*, 967 F.3d at 1296.

28       [13] *See also* Inventive Concept Chart # 10, 12, 27, 30 (describing benefits of pairing before data transfer).

United States District Court
Northern District of California

United States District Court
Northern District of California

which a link key has been exchanged (either before connection establishment was requested or during [the] connection phase." (Dkt. No. 193-25 ("2007 Bluetooth Specification") at 18; *see also* 1999 Bluetooth Specification at 53 (same definition).)  Cellspin's experts therefore opine that the "conventional definition" of "pairing" is "[a] connection among Bluetooth devices in which a link key has been exchanged (either before connection establishment was requested or during [the] connection phase." (Foley Report ¶ 42; Garlick Report ¶ 43.)  That definition is less abstract because it involves a concrete implementation:  exchanging a key.  However, the reliance on the Bluetooth specification completely defeats any claim to non-conventionality.  While mere mention of a feature in prior art may not be sufficient, a feature recited in the *definitions* of a well-known technology must necessarily be conventional.

Cellspin claims that even if pairing was conventional, establishing a paired connection before data transfer is not.  That claim defies logic.  Conventional pairing, according to Cellspin's experts, exchanges a key "*either before* connection establishment[14] was requested *or during* the connection phase." (Foley Report ¶ 42 (emphasis supplied); Garlick Report ¶ 43.)  The definition is disjunctive:  if exchanging a key before *or* during the connection required to transfer data was conventional, then the former is necessarily conventional.  In any case, none of Cellspin's experts actually opine that this feature was non-conventional.[15]  They simply state that pairing before data transfer was not required by Bluetooth and then rebut Defendants' cited references. (*See* Foley Report ¶¶ 138-39; Garlick Report ¶¶ 143-150.)  Because pairing before data transfer was part of the very definitions and nomenclature of Bluetooth, and Cellspin's experts admit that Bluetooth was conventional, that cannot create a genuine dispute of fact. (*See* Foley Report ¶ 155; Singh Report ¶ 107; Garlick Report ¶ 124.)

---

[14] The specification explains that a connection is required before sending data packets. (2007 Bluetooth Specification at 160.)  This clause thus necessarily involves pairing before data transfer.

[15] Cellspin's experts discuss the inventiveness of pairing before data is *captured*, but provide no non-conclusory opinion that pairing before data *transfer* was non-conventional. (*See, e.g.*, Foley Report ¶ 284; Singh Report ¶ 236.)  The claims do not require pairing before data capture:  they define "new data" as data captured after pairing, but the open-ended "comprising" claims permit capturing other types of data. (*See* '752 Patent at claim 1.)

1    Accordingly, the Court grants summary judgment that establishing a paired connection

2    before data transfer does not provide an inventive concept under 35 U.S.C. § 101.[16]

3    **D.    Category Three:  HTTP at an Intermediary Device**

4    Cellspin claims that the use of HTTP by an intermediary device and while the data was in

5    transit was nonconventional.  (Inventive Concept Chart # 11; *see also id.* # 13 ("Using HTTP at a

6    specific location (i.e.,[] at the intermediary device"), 21 ("Using HTTP to transfer data received

7    over a paired wireless connection to web services"), 21 (duplicate) ("Applying HTTP to data in

8    transit and on intermediary mobile device"), 22 (HTTP request), 44 ("converting data for HTTP"),

9    48 (using HTTP in transit at an intermediary device), 52 (applying HTTP).)

10    Defendants come nowhere close to meeting their burden to show that this element was

11    conventional.  In their opening brief, Defendants focus on the conventionality of HTTP itself.

12    They argue, for instance, that Dr. Foley admitted that HTTP was a pervasive technology by 2007.

13    (Foley Depo. at 94:19-95:22.)  They also point out that the specification mentions HTTP only

14    once, even though that the Federal Circuit rejected that exact argument in this very case.  *See*

15    *Cellspin*, 927 F.3d at 1317 ("[T]he specification need not expressly list all the reasons why this

16    claimed structure is unconventional.").  Last, Defendants cite their expert, Dr. Madisetti, who

17    opines that HTTP was known and describes several references that describe using HTTP to

18    connect to the Internet as "conventional."[17]  (Madisetti Report ¶ 85.)

19    All this shows is that HTTP was known individually, not that its use at an intermediary

20    device was known.  *See BASCOM*, 827 F.3d at 1350 (finding that although filtering content was

21    well-known, doing so at the ISP server provided an inventive concept).  With regard to that aspect,

22

23    [16] Cellspin cites the same expert testimony as for the first category, which does not show a
genuine dispute of fact.  (*See* Foley Report ¶¶ 111-12 (conclusory disagreement with Defendants'

24    expert), 116 (same), 200 (calling Bluetooth pairing "rudimentary" despite its inclusion in the 1998
specification), 212 (pairing was optional); Singh Report ¶¶ 103, 107, 121, 166 (identical opinions);

25    Garlick Report ¶¶ 119-20, 124-25, 174 (identical opinions)).  Such conclusory expert opinion does
not defeat summary judgment.  *See cxLoyalty*, 986 F.3d at 1378.

26    [17] The one-off prior art references generally do not establish conventionality.  *See*

27    *Berkheimer*, 881 F.3d at 1369 (mere disclosure in prior art insufficient).  Although the references
here go further by describing HTTP use over the Internet as "conventional," the alleged inventive

28    concept focuses on using HTTP at an intermediary device specifically.

United States District Court
Northern District of California

Defendants' sole evidence lies with Dr. Foley, who testified that HTTP *could* be used by a mobile phone to upload data—not that it *was* conventionally used that way when the mobile phone acted as an intermediary device.  (Dkt. No. 193-28 ("Foley Depo. II") at 78:19-79:8.)  Cellspin, on the other hand, cites detailed expert reports that in December 2007, the conventional process involved "end-to-end" HTTP that began with the data capture device, while mobile phones used the DUN protocol to relay data as a passive modem.  (*See* Foley Report ¶¶ 64, 74, 156.)  Indeed, according to several experts, companies like Facebook and Google did not release HTTP APIs until 2009, and even then, HTTP was used for "native" data only.  (*Id*. ¶ 254; Singh Report ¶ 148; Garlick Report ¶¶ 81-86.)  Cellspin also proffers evidence that using HTTP at an intermediary device provided technical benefits.  (*E.g.*, Foley Report ¶ 302.)

Defendants do not meaningfully address Cellspin's expert testimony and fail to provide their own evidence regarding the conventionality of applying HTTP at an intermediary device. They focus, instead, on legal arguments that the patents appear to be agnostic about using HTTP compared to other protocols.  For instance, Defendants point out that claim 1 of the '794 Patent permits either HTTP or a remote call procedure and that the specification similarly describes HTTP as an alternative to XML-RPC.  ('794 Patent at claim 1, 10:5-8.)  The Court broadly agrees that nothing in the asserted patents suggested that use of HTTP was the "invention" of the patents. However, because the patentee need not recite every inventive concept in the specification, this absence of evidence alone is not dispositive.  *See Cellspin*, 927 F.3d at 1317.

Accordingly, the Court denies summary judgment on this issue.[18]

### E.    Category Four:  Attaching User Information at the Intermediary Device

The same result follows for the next category.  Cellspin claims that it was nonconventional to attach user information at the intermediary mobile device before sending the data to a website. (Inventive Concept Chart # 36, 44, 51.)  This inventive concept follows the general theme that the

---

[18] Contrary to Cellspin's assertion, none of the claims require the data to be "in transit," and claim 1 of the '847 Patent expressly requires storing the data at the mobile device.  Thus, the Court denies summary judgment based on using HTTP at an intermediary device only (i.e., on the device between the data capture device and publishing website server).

asserted patents offload the work of the data capture device unto the mobile device.  (*Id.* # 22.)

Defendants cite *no evidence* in any form to show that attaching user information at an intermediary device was conventional.[19]  Instead, Defendants point to the complaint, which alleges that prior art computers attached HTTP headers and user data to "native" data—i.e., data that was generated by the computer itself.[20]  (*See* Dkt. No. 68 ("Compl.") ¶ 16; *see also* Foley Report ¶ 255 (discussing same).)  Defendants' reference does not show that attaching user information at an intermediary device was conventional or well-understood, even if it suggests that doing so was an obvious variation.  If computers already acted as intermediary devices and already attached user data before publication, it may be obvious to combine the two functions at a mobile device.  However, obviousness under 35 U.S.C. § 103 presents a different question than patent eligibility, and Defendants have not shown this to be "token post-solution activity" as a matter of law.  *See Diehr*, 450 U.S. at 191.  Whatever the merits of the alleged invention here, applying user data at a specific location to achieve a specific technical benefit is not an abstract idea, law of nature, or natural phenomenon, and Defendants have not shown it to be well-known, routine, or conventional.[21]

Accordingly, because Defendants fail to meet their burden to show that applying user data at intermediary device was conventional, the Court denies summary judgment on this issue.

---

[19] Defendants belatedly cite their expert, Dr. Madisetti, in their reply.  Dr. Madisetti discusses only attaching metadata to photos before publication, while citing prior art references.  (Madisetti Report ¶¶ 184-85.)  That does not show that attaching metadata at an intermediary device, as opposed to the data capture device, was conventional.

[20] Defendants argue that the claims do not recite native or non-native data.  However, each claim requires publishing data by a different device than the one that acquired it, which is all that non-native data involves.  (*See* '752 Patent at claim 1; Foley Report ¶ 255.)  That said, Cellspin does not apparently contend that applying HTTP to non-native data by a *computer* was non-conventional, which may eviscerate this distinction.  (*See* Dkt. No. 222 ("Tr.") at 37.)

[21] In their motion, Defendants focus on the phrase "significantly more" to argue that an inventive concept must have some magnitude or significance before it can create patent eligibility.  However, Defendants cite no case where the standard was used in this manner.  Although some judges on the Federal Circuit have suggested before *Alice* that "trivial" activity may not confer patent eligibility, *see, e.g.*, *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1283-84 (Fed. Cir. 2013) (divided en banc), the Court has found no decision post-*Alice* where that phrase was used to refer to the "significance" of the invention.  To the extent that this remains the standard, the Court sees no operational way to apply it as a matter of law and leaves it for the jury to decide.

United States District Court
Northern District of California

United States District Court
Northern District of California

### F.      Category Five:  Polling and Event Notification

Cellspin claims that "event notification" and "polling" of the data capture device by the mobile device provide an inventive concept.  (Inventive Concept Chart # 26, 30, 35, 41.)  The parties' experts disagree about the date when polling and event notification became routine in Bluetooth.  Defendants' expert opines that these features were well-known years before December 2007 but cites only prior art patents for the proposition, which may not be sufficient.  (Madisetti Decl. ¶¶ 179-82); *see Berkheimer*, 881 F.3d at 1369.  Cellspin's experts—including Dr. Foley, who acted as Bluetooth standards' group CEO in the relevant period—opines that native event notifications were only introduced into Bluetooth specifications in 2010.[22]  (Foley Report ¶ 259; Singh Report ¶ 69; Garlick Report ¶ 76.)

Notwithstanding the dispute between the experts, this question is close.  The claims do not recite any particular method of polling or event notifications, and the Court construed this term broadly as "checking status on a predetermined basis."  Notably, the construction was based in part on Dr. Foley's testimony regarding how a person of ordinary skill would understand polling to work at the time of the invention.  (*See* Dkt. No. 228 at 45-46.)  This definition did not derive from the specification or any method of polling unique to the asserted claims.  Indeed, Dr. Foley opined that a person of ordinary skill in the art would know how to implement pulling using a paired connection by reading the Bluetooth specification.[23]  (*See* Dkt. No. 193-27 ("Foley Depo III") at 48:14-21.)  Thus, the claims here appear to "simply instruct[] the reader" to use polling or event notifications "without limitation to particular ways to do so."  *Am. Axle*, 967 F.3d at 1298.

---

[22] The Federal Circuit may want to consider whether an inventive concept must refer to the *patentee's* own invention.  Cellspin does not contend that it invented polling or event notifications.  Under *Berkheimer*, however, it may evade patent ineligibility simply by reciting someone else's unconventional invention.  This result appears to contradict the Supreme Court's instruction that patent eligibility should not "depend simply on the draftsman's art."  *Alice*, 573 U.S. at 224 (quoting *Flook*, 437 U.S. at 593).

[23] Dr. Foley did not specify the year of the specification (e.g., 2007 or 2010).  Defendants cite several portions of the 2007 Bluetooth specification, but fail to provide expert testimony to explain the rather obscure parameters cited.  (*See, e.g.*, 2007 Bluetooth Specification at 661 ("user passkey notification event" for "simple pairing"), 662 ("keypress notification event").)  Notably, the claims require event notification and polling for new data specifically, not generic polling.

United States District Court
Northern District of California

Nevertheless, because disputes of fact remain over whether polling and event notifications were used to detect the presence of new data (which, Dr. Foley opines, provides technical benefits, such as power savings) and after pairing, a reasonable jury may find that this feature provides an inventive concept. Accordingly, the Court denies summary judgment on this issue.

## G. Remaining Categories

At the end of its brief, Cellspin cites nine additional inventive concepts, while attaching an exhibit having 55 other inventive concepts. As Cellspin effectively admits, these allegations amount to little more than "the whole claim is inventive." (*See, e.g.*, Opp. at 20:27-28 (the "novel architecture" is "the entirety of the inventions as claimed").) These concepts fall into three general categories: (1) inherent benefits of the features described above, (2) combinations of various inventive concepts as an "ordered combination," and (3) additional inventive concepts related to encryption and cryptography. Of these, only the last category may supply an inventive concept.

### 1. *Inherent Benefits*

Cellspin first lists a number of "inherent" benefits of the inventive concepts previously described. A benefit is "inherent" if it is necessarily present when the other limitations are met. *See In re Huai-Hung Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011); *see also In re Kubin*, 561 F.3d 1351, 1357 (Fed. Cir. 2009) (finding patent invalid where an inherent benefit "is not an additional requirement imposed by the claims . . . but rather a property necessarily present" when the other limitations are satisfied).

Here, Cellspin claims that the invention allows, for example, the data capture device to be less bulky and expensive. (Inventive Concept Chart # 1; *see also id*. # 3-7 (similar).) This benefit is inherent to the two-step, two-device structure: where the mobile device performs the functions of a data capture device, the latter device can necessarily be smaller and less functional. Similarly, Cellspin claims benefits related to using a wireless, paired connection and a mobile application, such as minimal user intervention (*id*. # 23) and real-time publishing (*id*. # 24). Again, these benefits are a necessary consequence of automation and inherently present when such automation is used in the two-step, two-device structure. Last, Cellspin claims the benefits of transferring data after pairing has been established, such as avoiding data transfers when the devices are out of

range (*id.* # 30).  This, too, is inherent in the concept of pairing before transferring data.

These alleged benefits cannot supply an inventive concept for two reasons.  First, for the reasons described above, many of the features that create the benefits are themselves well-known, routine, and conventional and thus cannot supply an inventive concept.  Where the feature itself does not transform the claims, neither does recognizing a benefit of the feature.  *Cf. Kao*, 639 F.3d at 1070 (in the section 103 context, merely recognizing a previously unknown benefit does not prevent invalidity).  Second, even if recognizing a previously unknown benefit was enough, the patents here do not claim such benefits.  For example, the claims do not *require* the data capture device to be smaller and less functional; they merely *allow* it.[24]  Similarly, the claims do not *require* the device to avoid transmitting data out of range; they merely define "new data" to include data captured after the devices are in range to establish pairing.  As such, the unclaimed benefits cannot supply an inventive concept.  *See Am. Axle*, 967 F.3d at 1293.

Accordingly, the Court finds that the concepts based on the benefits of other features cannot supply an inventive concept:  to the extent that the feature is conventional or abstract, the alleged benefit does not change the equation, and to the extent that the feature may supply an inventive concept, the benefits inquiry collapses into that determination.  The Court therefore grants summary judgment on inventive concepts 1, 3-7,10, 12, 27, 30, 39, 42, 43, 23(a), 24, 25, 27-28, 38, 45, 50, 53.

## 2.    *Ordered Combinations*

Cellspin next claims combinations of the inventive concepts alleged above, as well as the ordered combination of virtually every limitation recited in the claims.  For instance, Cellspin claims an inventive concept based on polling over an established paired connection, which is a combination of polling and capturing data after pairing, discussed above.  (*See* Inventive Concept Chart # 35; *see also id.* # 23 (attaching HTTP and user information at the mobile device).)  Cellspin also claims that the "overall ordered combination of elements recited" in the claims was

---

[24] The only claimed benefit involves using the GUI of the mobile device.  (*See* Inventive Concept Chart # 43.)   A GUI is not even arguably inventive, however, and purely generic limitations related to executing "instructions" to "provide a graphical user interface (GUI) for the new-data" cannot supply an inventive concept.  (*Id.*)

United States District Court
Northern District of California

1  inventive.  (*Id*. # 17-20.)  Last, Cellspin claims generic statements regarding combinations.  (*See*

2  *id*. # 14 (describing "implementing even a well-known technique" with "particular devices in a

3  specific combination"), 15 ("The combined and cumulative application of the claimed

4  elements").)

5       As an initial matter, the Court finds it appropriate to place the burden of production (but

6  not the burden of persuasion) on Cellspin for these allegations.  Courts routinely place the burden

7  of production on the patentee where it has greater knowledge and the party challenging validity

8  would otherwise have the burden to prove a negative.  For example, where an accused infringer

9  establishes a prima facie case of invalidity based on anticipation, the patentee has the burden to

10  "go[] forward with evidence" and "persuasive argument" that they are entitled to an earlier priority

11  date.  *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327-28 (Fed. Cir. 2008).  Similarly,

12  where a party challenging validity demonstrates that the prior art discloses an overlapping range,

13  the patentee has the burden to come forward with evidence that the range claimed in the patent is

14  non-obvious.  *See E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1008 (Fed. Cir.

15  2018).  This rule makes sense because proving a negative—e.g., that a patentee is not entitled to

16  every possible priority date—is disfavored and inferring facts about a whole based on its parts,

17  and vice versa, is reasonable.  *See id.*

18       With respect to inventive concepts, the Federal Circuit has explained that the analysis

19  involves two "distinct" inquiries:  first, whether the individual and patent-eligible claim elements

20  are "well-understood, routine, or conventional," and second, whether an analysis of those elements

21  "as an ordered combination" "add[s] nothing" beyond the individual concepts.  *Chamberlain*, 935

22  F.3d at 1348-49.  While the first inquiry undoubtedly rests with the party challenging validity, *see*

23  *Berkheimer*, 890 F.3d at 1371, the second inquiry necessarily depends on the patentee's arguments

24  for "additional" inventiveness based on a combination of otherwise conventional elements.  Thus,

25  where the defendants have established a prima facie case that individual elements or concepts are

26  conventional in the first instance, the Court finds it appropriate to place the burden of production

27  on the patentee to come forward with evidence and argument that the "ordered combination"

28  requires additional or different analysis.

United States District Court
Northern District of California

Accordingly, the Court ordered Cellspin to provide supplemental briefing to identify *each* inventive concept based on an ordered combination, as well as what the combination "adds" to the analysis beyond the individual concepts.  (*See* Dkt. No. 175.)  Cellspin's supplemental submission confirms that the combinations add nothing.  Cellspin's arguments for these alleged inventive concepts wholly overlap with its arguments for the individual inventive concepts analyzed above. (*See* Dkt. No. 220 ("Suppl. Brief").)  For instance, Cellspin claims the ordered combination of the elements permits efficient transfers of data and real-time publishing, which is exactly the same argument as for a two-step, two-device structure connected using a wireless, paired connection. (*Id*. at 2.)  Although Cellspin claims that all of the limitations are needed to achieve real-time publishing,[25] it provides no supporting evidence or argument for that proposition.  For instance, it does not explain why event notifications or pairing are necessary to achieve that result.  Cellspin's evidentiary citations are also the same, other than conclusory expert opinion that the asserted claims "as a whole" were non-conventional.  (*See* Foley Report ¶¶ 249-53.)

Absent concrete evidence that the ordered combination adds something beyond the individual inventive concepts described in this Order, Cellspin is left to argue that each of those concepts "does not confer the totality of the benefits and the complete solution."  (Suppl. Brief at 2-3.)  This does not show, however, that the combination adds any inventiveness beyond the cumulative inventiveness of the individual concepts.  Because Cellspin has not shown that analyzing the combination requires a different analysis than analyzing the individual concepts separately, Cellspin's arguments for these inventive concepts fail.[26]

Accordingly, the Court grants summary judgment on inventive concepts 16-20, 23-24, 31.

---

[25] Cellspin's argument for this concept appears to hinge on the software module in the mobile device performing the claimed functions.  (*See* Inventive Concept Chart # 38.)  Cellspin does not claim, however, to have invented smartphones or smartphone apps.  To the extent that these functions could have been performed by an intermediary computer, merely leveraging the ability of a mobile phone to act as one is insufficient.

[26] Notably, although Cellspin claims seven inventive concepts based on combinations, its evidence and arguments are identical for each and cross-reference each other.  (*See* Suppl. Brief at 4 (concept 17 cross-referencing analysis for concept 16 and citing the same evidence), 5 (same for 18), 6 (same for 19), 7 (same for 20), 9 (same for 24, but relating it to "real time" situations), 10 (same for 31, but calling it an "unconventional architecture").)

United States District Court
Northern District of California

United States District Court
Northern District of California

3.     *Cryptography*

Last, Cellspin claims an inventive concept based on using cryptographic authentication, either individually for physically separate devices or when combined with pairing.  (*See* Inventive Concept # 33, 49.)  Defendants correctly point that courts have found cryptographic encryption and authentication to be conventional.  *See Intellectual Ventures II LLC v. JPMorgan Chase & Co.*, No. 13-CV-3777 AKH, 2015 WL 1941331, at *14 (S.D.N.Y. Apr. 28, 2015).  Defendants introduce evidence that the 2007 Bluetooth specification described authentication and encryption, which confirms as much.  (Madisetti Decl. ¶ 187.)  Moreover, the construction of the term "cryptographically authenticated" in this case is wholly generic:  the Court construed the term as "authenticated using a cryptographic algorithm" based on the parties' apparent agreement on this interpretation.[27]  The claims thus do not require any particular inventive method of encryption or authentication—they claim only a functional result.  The Court therefore agrees that cryptographic authentication (for either the same or a different device) cannot supply an inventive concept.[28]

With respect to using cryptographic authentication together with pairing, however, Defendants introduce no evidence that such secured pairing were conventional.  Cellspin's experts provide conclusory opinions that using encryption keys in pairing was "unknown."  (Foley Report ¶¶ 266; Singh Report ¶ 222.)  Cellspin further proposed to construe a "secured paired Bluetooth connection" as "a connection in which one or more optional Bluetooth security methods are implemented" during claim construction, which appears to confirm that such "optional" methods were routine.  (*See* Claim Construction Statement at 11.)  Defendants do not address the expert opinions or provide their own evidence or argument that cryptography was commonly used with pairing.  Defendants thus fail to meet their burden to show that this concept was well-understood, routine, and conventional.

---

[27] Although the Court construed "cryptographically authenticated" as used in the '847 Patent, Cellspin expressly argued for similar constructions in the '752 Patent.  (*See* Dkt. No. 153 at 19 (relying on claim language in '752 Patent).)

[28] As with the previous concepts, Cellspin's conclusory expert opinion does not create a genuine dispute of fact.  (*See* Foley Report ¶¶ 266-67, 287; Singh Report ¶ 239.)  Nor does the claim that cryptographic authentication was "optional" in Bluetooth (because one conventional option among others is still conventional).  (Foley Report ¶¶ 212-13.)

1        Accordingly, the Court grants summary judgment on inventive concept 49, but denies it for

2 inventive concept 33.[29]

3 **IV.**     **CONCLUSION**

4        In summary, and for the foregoing reasons, the Court **DENIES** Defendants' motion for

5 summary judgment of Section 101 invalidity based on the following inventive concepts only:

6          •   Applying HTTP and user information at an intermediary device;

7          •   Polling and event notifications to detect the presence of new data after pairing;

8          •   Using cryptographic methods together with pairing.

9 The Court **GRANTS** Defendants' motion on the remaining alleged inventive concepts.

10

11        This terminates docket No. 193 in case number 4:17-cv-5933.

12

13        **IT IS SO ORDERED.**

14

15 Dated: April 14, 2021

16                                   **YVONNE GONZALEZ ROGERS**

                                     **UNITED STATES DISTRICT COURT JUDGE**

17

18

19

20

21

22

23

24

25

26

27        [29] Summary judgment is further granted as to legal conclusions claimed as inventive

28 concepts (*see* Inventive Concept Chart # 8, 14-15) and inventive claims based on combinations not raised in Cellspin's supplemental brief. (*E.g.*, *id.* # 47.)

United States District Court
Northern District of California